**PUBLISHED**

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

KENNETH C. ROSSIGNOL; ISLAND
PUBLISHING COMPANY, a/k/a St.
Mary's Today,
        *Plaintiffs-Appellants,*

v.

RICHARD J. VOORHAAR, Sheriff, St.
Mary's County Sheriff's Office;
RICHARD FRITZ, State's Attorney for
St. Mary's County, Maryland;
DANIEL ALIOTO, Deputy First Class,
St. Mary's County Sheriff's Office;
STEVEN DOOLAN, Captain, St. Mary's
County Sheriff's Office; LYLE LONG,
Sergeant, St. Mary's County
Sheriff's Office; MICHAEL MERICAN,
Sergeant, St. Mary's County
Sheriff's Office; STEVEN MYERS,
Deputy First Class, St. Mary's
County Sheriff's Office; EDWARD
WILLENBORG, Sergeant, St. Mary's
County Sheriff's Office; HAROLD
YOUNG, Deputy First Class, St.
Mary's County Sheriff's Office;
BOARD OF COUNTY
COMMISSIONERS FOR ST. MARY'S
COUNTY, MARYLAND,
        *Defendants-Appellees,*

and

JOHN DOES, 1-50,
        *Defendants.*

No. 02-1326

THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS; AMERICAN
SOCIETY OF NEWSPAPER EDITORS;
ASSOCIATION OF ALTERNATIVE
NEWSWEEKLIES; MARYLAND-
DELAWARE-DC PRESS ASSOCIATION;
MARYLAND MEDIA,

*Amici Curiae in Support of Appellants.*

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
William M. Nickerson, Senior District Judge.
(CA-99-3302-WMN)

Argued: October 30, 2002

Decided: January 16, 2003

Before WILKINSON, Chief Judge, GREGORY, Circuit Judge, and
Frank J. MAGILL, Senior Circuit Judge of the United States Court
of Appeals for the Eighth Circuit, sitting by designation.

Reversed and remanded by published opinion. Chief Judge Wilkinson
wrote the opinion, in which Judge Gregory and Senior Judge Magill
joined.

**COUNSEL**

**ARGUED:** Ashley Ivy Kissinger, LEVINE, SULLIVAN & KOCH,
L.L.P., Washington, D.C., for Appellants. Daniel Karp, ALLEN,
KARPINSKI, BRYANT & KARP, Baltimore, Maryland, for Appel-
lees. **ON BRIEF:** Lee Levine, Seth D. Berlin, Audrey Billingsley,
LEVINE, SULLIVAN & KOCH, L.L.P., Washington, D.C.; Alice

Neff Lucan, Washington, D.C., for Appellants. Victoria M. Shearer, Kevin Karpinski, ALLEN, KARPINSKI, BRYANT & KARP, Baltimore, Maryland; John F. Breads, Jr., Columbia, Maryland, for Appellees. Paul M. Smith, Thomas J. Perrelli, Nathan C. Guerrero, Brian Hauck, JENNER & BLOCK, L.L.C., Washington, D.C., for Amici Curiae; Lucy A. Dalglish, Gregg P. Leslie, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Arlington, Virginia, for Amicus Curiae Committee; Richard M. Schmidt, Jr., Kevin M. Goldberg, COHN & MARKS, L.L.P., Washington, D.C., for Amicus Curiae Society; Richard Karpel, ASSOCIATION OF ALTERNATIVE NEWSWEEKLIES, Washington, D.C., for Amicus Curiae Newsweeklies.

---

**OPINION**

WILKINSON, Chief Judge:

Plaintiff Kenneth Rossignol brought suit against defendants for their organized efforts to suppress the distribution of the election day issue of plaintiff Island Publishing Company's newspaper, *St. Mary's Today*. Plaintiffs sought damages and injunctive relief under 42 U.S.C. § 1983, the Maryland Constitution, and Maryland common law. The district court granted summary judgment to defendants on plaintiffs' federal claims on the grounds that defendants had not acted under color of state law. It then dismissed plaintiffs' remaining state claims without prejudice. *Rossignol v. Voorhaar*, 199 F. Supp. 2d 279, 286-89 (2002). Because defendants sought to censor plaintiffs' criticism of them in their official roles, because their official positions were an intimidating asset in the execution of their plan, and because this sort of quasi-private conspiracy by public officials was precisely the target of § 1983, we reverse the judgment and remand for further proceedings consistent with this opinion.

I.

The facts of this case are largely undisputed. *St. Mary's Today* is a weekly newspaper owned by Kenneth Rossignol and primarily serving St. Mary's County in southern Maryland. It has reported exten-

sively and often critically on local government and public officials, including County Sheriff Richard Voorhaar and his deputies, from "Captain [Steven] Doolan at the top of the rank . . . all the way to the bottom." In defendants' own words, *St. Mary's Today* published "constant belittlement" and "scandalous things" about the sheriff's deputies' performance, including what they "buy for the agency, equipment, [and] positions [they] ask for." Nor was this just "one article"; it was constantly, "week, after week, after week." This criticism also extended to a personal friend of Voorhaar named Richard Fritz, a candidate for St. Mary's County State's Attorney in the November 1998 elections who enjoyed broad support in the Sheriff's Office.

Several deputies in the Sheriff's Office anticipated that the election day issue of *St. Mary's Today* would be critical of them and their favored candidates, particularly Voorhaar and Fritz. Over the course of a series of meetings and conversations, both on the job at the Sheriff's Office and in the evening at private homes, some of the deputies formulated a plan to deal with this problem. They decided to form two teams on election day, each comprising three sheriff's deputies, and buy out the stock of *St. Mary's Today* at vending locations throughout the county. They viewed the seizure as a "good opportunity" for two things: "to piss [Rossignol] off" and to "protest [their] disagreement" with Rossignol's "irresponsible journalism." They planned to stage a "bonfire party" when the seizure was completed.

The election day issue of *St. Mary's Today* bore the front-page headline "Fritz Guilty of Rape." It accurately reported that in 1965, Fritz and three other men had pled guilty to carnal knowledge of a fifteen-year-old girl. Fritz, who was eighteen at the time of the rape, was sentenced to probation and a suspended sentence of eighteen months in state prison. The same article reported that Fritz's opponent had been convicted of marijuana possession in 1973. Another article in the issue also reported an EEOC complaint which charged that Voorhaar had assigned a deputy who complained of sexual harassment to work directly under the supervision of the harasser. Six thousand five hundred total copies of *St. Mary's Today* were printed: 2,600 papers delivered to stores in St. Mary's County, 1,100 placed in newspaper boxes throughout the county, 1,100 delivered by mail to subscribers, and 1,700 distributed to other counties. Each copy cost seventy-five cents.

Late on the night before the election, six sheriff's deputies set out in two cars. The officers were off duty, wearing plainclothes, and driving their personal cars. They drove throughout the county, buying newspapers from both newsboxes and local stores. To prove that they were purchasing the newspapers and not stealing them, defendants got receipts from the stores and videotaped themselves removing papers from newsboxes. Later that night, Rossignol discovered defendants' plan and drove through the county attempting to resupply the stores and newsboxes. But defendants followed him around the county, buying up the fresh inventory as soon as it was replenished.

During the course of the mass purchase, a group of defendants met with an on-duty sheriff's deputy who had contacted them on their department-issued pagers in order to conduct official business. Some defendants also stopped at a Sheriff's Office outpost to use facilities there during the course of the evening. One defendant wore his Fraternal Order of Police sweatshirt with the word "Sheriff" written on top of the county seal. Two other defendants carried their service weapons during the mass purchase; those firearms are visible on two videotapes of the incident and were noticed by at least one eyewitness.

Many local clerks were quite familiar with county law enforcement personnel because of 7-Eleven's policy of giving free coffee and soft drinks to police officers, even those out of uniform. Thus, many of the clerks who interacted with defendants during the night knew that they were sheriff's deputies. One clerk testified that he sold the full supply of the paper to defendants because they were police officers, had a "real intimidating attitude," and made it "real apparent [that] they could make my life here a living hell." A different clerk told one of her store's other customers that the St. Mary's deputies were taking all of the papers. A manager of one 7-Eleven was told by one of her night employees that "it was a police officer [who] bought them." A clerk at another store also explained to her manager the next morning that "cops came in and bought them all." And a police report on the incident further notes that "several of the clerks" at convenience stores and a night watchman at Walmart had "recognized some of [the men involved in the seizure] as St. Mary's County Deputies."

The mass purchase was completed at approximately 7:00 a.m., defendants having visited roughly forty stores and forty newsboxes

and removed at least 1,300 copies of the paper. At least 300 more copies were seized without payment from retailers who had not yet opened, but defendants contend that any copies taken without payment were not taken by them. One witness testified that after the mass purchase he could not find "any papers anywhere in the county."

Both Voorhaar and Fritz personally supported and participated in the mass purchase. Approximately one week before the election, one deputy spoke with Voorhaar and secured his approval for the plan. Voorhaar approved the plan, personally contributed $500 to defray purchasing costs, and wished his deputies "good luck" on the endeavor. He also personally purchased multiple copies of the newspaper early in the morning on election day. And during the days following the election, he made extensive comments in local media defending and celebrating the seizure. Likewise, Fritz explicitly approved the plan and was directly involved in planning its implementation and mapping out with the other defendants exactly how they should proceed on the night before election day. Fritz's co-defendants testified that he contributed $500 of his own money to the seizure; at a minimum, he served as a conduit for contributions which had been given to him. He also offered legal advice to defendants about the constitutionality of their plan, researching the issue before advising them that it was legal under both Maryland and federal law.

Plaintiffs brought suit in November 1999, alleging violations of their rights under the First, Fourth, and Fourteenth Amendments, as well as under the Maryland Constitution and at common law. After extensive discovery, the parties filed cross-motions for summary judgment. In February 2002, the district court granted summary judgment against plaintiffs on the § 1983 claims and accordingly dismissed plaintiffs' state law claims without prejudice. Plaintiffs now appeal.

## II.

As a threshold matter, there can be no question that, if defendants acted under color of state law, they violated these plaintiffs' constitutional rights. The seizure clearly contravened the most elemental tenets of First Amendment law. First, defendants targeted Rossignol's newspaper for suppression and retaliation because they disagreed with

its viewpoint and intended to prevent its message from being disseminated. This by itself was sufficient to violate the Constitution. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). And when, as here, the government targets "not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829; *see also R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992).

Second, the category of speech that defendants suppressed "occupies the core of the protection afforded by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995). "Discussion of public issues" and "debate on the qualifications of candidates" for public office have always been "integral to the operation of the system of government established by our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam). And "it is by no means easy to see what statements about a candidate might be altogether without relevance to his fitness for the office he seeks." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 275 (1971) (overturning state libel judgment against newspaper for criticism of a political candidate three days before the primary). The First Amendment therefore "affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas,'" since "[i]n a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential." *Buckley*, 424 U.S. at 14-15 (citations omitted). It is for that reason that the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co.*, 401 U.S. at 272. In suppressing criticism of their official conduct and fitness for office on the very day that voters were heading to the polls, defendants did more than compromise some attenuated or penumbral First Amendment right; they struck at its heart.

Third, the fact that defendants paid for the newspapers in no way affects the conclusion that the seizure violated plaintiffs' right to disseminate core political speech. "Governmental restraint on publishing need not fall into familiar or traditional patterns to be subject to constitutional limitations on governmental powers." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256 (1974). The First Amend-

ment is about more than a publisher's right to cover his costs. Indeed, it protects *both* a speaker's right to communicate information and ideas to a broad audience *and* the intended recipients' right to receive that information and those ideas. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. PICO*, 457 U.S. 853, 867 (1982). Liberty of circulation is as important to freedom of the press "as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (quoting *Ex parte Jackson*, 96 U.S. 727, 733 (1877)).

It is because of the inherently communicative purpose of First Amendment activity that compensation in the form of lost profits is legally insufficient as a remedy for the loss of First Amendment freedoms. *See Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (plurality opinion) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)). The fact that a small newspaper seeks to turn a meager profit does not remove it from the protections of the First Amendment. The Supreme Court has made clear that "the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5. What matters is that defendants intentionally suppressed the dissemination of plaintiffs' political ideas on the basis of their viewpoint. And in doing so before the critical commentary ever reached the eyes of readers, their conduct met the classic definition of a prior restraint. *E.g.*, *Near v. Minnesota*, 283 U.S. 697 (1931).

### III.

The district court granted summary judgment for defendants on the grounds that "the mass purchase constituted private conduct not executed under color of state law" as required by 42 U.S.C. § 1983. 199 F. Supp. 2d 279, 289 (D. Md. 2002). In so holding, it necessarily denied plaintiffs' motion for partial summary judgment as well. We review these rulings de novo. *Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 340-41 (4th Cir. 2000). When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law." *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st. Cir 1997) (citation and

internal punctuation omitted). When considering each individual motion, the court must take care to "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the party opposing that motion. *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996).

To state a claim for relief under § 1983, plaintiffs must demonstrate that defendants' effort to suppress the distribution of *St. Mary's Today* was perpetrated under color of state law. 42 U.S.C. § 1983 (2002). The color of law requirement excludes from the reach of § 1983 all "merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation and internal punctuation omitted). If the substance of § 1983 is not to be substantially eviscerated, however, "its ambit cannot be a simple line between States and people operating outside formally governmental organizations." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).[1] Section 1983 therefore includes within its scope apparently private actions which have a "sufficiently close nexus" with the State to be "fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). "[T]here is no specific formula for defining state action" under this standard. *Hicks v. Southern Maryland Health Sys. Agency*, 737 F.2d 399, 402 n.3 (4th Cir. 1984) (quoting *Howerton v. Gabica*, 708 F.2d 380, 383 (9th Cir. 1983)). Rather, the question of what is fairly attributable to the State "is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Academy*, 531 U.S. at 295.

---

[1]*Brentwood* and several other cases cited herein addressed the issue of state action. They control our inquiry nonetheless, since if a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, it also constitutes action "under color of state law" for the purposes of § 1983. *Id.* at 295 n.2 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1982)). In the course of its state action inquiries, the Supreme Court has not opted for an objective or subjective test, but simply for a look at the totality of circumstances that might bear on the question of the nexus between the challenged action and the state.

## A.

We have no doubt that the seizure in this case was perpetrated under color of state law. The requisite nexus between defendants' public office and their actions during the seizure arose initially out of their censorial motivation. Defendants executed a systematic, carefully-organized plan to suppress the distribution of *St. Mary's Today*. And they did so to retaliate against those who questioned their fitness for public office and who challenged many of them in the conduct of their official duties. The defendants' scheme was thus a classic example of the kind of suppression of political criticism which the First Amendment was intended to prohibit. The fact that these law enforcement officers acted after hours and after they had taken off their badges cannot immunize their efforts to shield themselves from adverse comment and to stifle public scrutiny of their performance. *Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 872 (4th Cir. 1989).

To begin with, it is clear that if a defendant's purportedly private actions are linked to events which arose out of his official status, the nexus between the two can play a role in establishing that he acted under color of state law. In *Layne v. Sampley*, 627 F.2d 12 (6th Cir. 1980), for example, an off-duty police officer was in plain clothes, had been on vacation for several days, and was sitting in his personal car when he shot the plaintiff. The Sixth Circuit nonetheless held that there was sufficient evidence to support a finding that the defendant had acted under color of state law, in large part because "the animosity grew out of [the officer's] performance of his official duties." *Id.* at 13. And in *United States v. Causey*, 185 F.3d 407 (5th Cir. 1999), the Fifth Circuit held that a police officer had acted under color of state law when he conspired with two civilians to murder a woman who had filed police brutality charges against him. Important to the decision was the fact that the desire to retaliate against the victim arose out of her criticism of the defendant's actions in his official capacity. *Id.* at 415-16.

Indeed, where the action arises out of purely personal circumstances, courts have not found state action even where a defendant took advantage of his position as a public officer in other ways. For example, in *Martinez v. Colon*, 54 F.3d 980 (1st Cir. 1995), an on-duty police officer shot his coworker with a state-issued revolver

while they were both in the stationhouse. The court nonetheless held that the defendant had not acted under color of state law because the shooting had arisen from a "singularly personal frolic: tormenting an acquaintance," and because defendant's "status as a police officer simply did not enter into" his decision to torment the victim. *Id.* at 987; *see also Bonsignore v. City of New York*, 683 F.2d 635, 638-39 (2d Cir. 1982) (no state action where police officer shot his wife with a police revolver and then committed suicide).

The actions here arose out of public, not personal, circumstances. Where the sole intention of a public official is to suppress speech critical of his conduct of official duties or fitness for public office, his actions are more fairly attributable to the state. That was the case here. Defendants were enraged by what they called Rossignol's "unsavory journalism." And they had reason to dislike his coverage: their depositions detail at length Rossignol's past attacks on their performance of official duties. They were also convinced that *St. Mary's Today* would print election day attacks on "Voorhaar [or] anybody that was not on [Rossignol's] ticket." So they decided both to punish Rossignol's previous speech by "piss[ing] him off" and to suppress his expected election day criticism of Sheriff Voorhaar's performance in office. Defendants' statements on the videotapes recorded that evening further emphasize their desire to "cleanse the filth" printed in the newspaper and prevent the "pack of lies" from being circulated. Among other comparable comments, one deputy said, "you call us idiots, Rossignol? We'll show you. . . . We'll show you, Rossignol; that's all I got to say." Another deputy stated that "we don't believe in blasphemy being published, so we're buying them all."

In their scheme to silence disrespectful speech, defendants seemed called to resurrect the discredited concept of a criminal libel, which was broadly invoked in seventeenth and eighteenth century England to silence adverse comment on public personages, all in the name of preserving "the King's peace." As one historian has noted, however, the King's peace was "as wide a phrase as the King's English. To disturb the King's peace of mind was probably a breach of the King's peace. . . . [A criminal libel] might bring institutions or prominent persons into contempt, or hatred, or ridicule." William H. Wickwar, *The Struggle for the Freedom of the Press* 20 (1928). It goes without saying that this stigmatization of speech critical of public officials

was among the chief evils that the First Amendment sought to combat.

Ultimately, defendants were driven by a desire to retaliate against Rossignol's past criticism of their fitness for office and to censor future criticism along the same lines. This link between the seizure's purpose and defendants' official roles helps demonstrate that defendants' actions bore a "sufficiently close nexus" with the State to be "fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. at 351.[2]

B.

Several additional factors reinforce our conviction that defendants acted under color of state law.

Among these was defendants' ability to use their positions in the Sheriff's Department to ensure that they would not be prosecuted for their election day seizure. Under Maryland law, the Newspaper Theft Act prohibits "knowingly or willfully obtain[ing] or exert[ing] control that is unauthorized over newspapers with the intent to prevent another from reading the newspapers." Md. Code, Criminal Law § 7-106(b) (2002) (recodified version of law in effect during the seizure). The Act was passed to criminalize such events as the *St. Mary's Today* seizure: mass censorship-oriented appropriations of newspapers which cannot otherwise be punished as theft. *See* Thomas W. Waldron, "Pilfered Papers: If a Crime, What Punishment?", *Balt. Sun*, Jan. 5, 1994, at 1B (discussing history leading to passage of Act); Editorial, "Can You 'Steal' a Free Paper?", *Wash. Post*, Jan. 22, 1994, at A16 (same). In other words, defendants' efforts to prevent St. Mary's County readers from reading Rossignol's newspaper put them in direct peril of criminal prosecution under Maryland law.

---

[2]The principal case defendants cite in opposing this conclusion is not controlling here. *See Hughes v. Halifax Cty. Sch. Bd.*, 855 F.2d 183 (4th Cir. 1988). Its brief and factbound discussion of state action focused on defendants' spur-of-the-moment harassment of a coworker in the workplace rather than a conspiracy to suppress by prior restraint the distribution of election day political speech.

Voorhaar's position as Sheriff, however, gave him the ability to help shield his coworkers from the consequences of their crime through both formal direction of his department's investigations and informal ties to other law enforcement agencies. And his personal contribution of $500 made Voorhaar part of the conspiracy and served as a bond of solidarity with the other deputies involved in the seizure. Resting on the powers of his public office and his own self-interest in avoiding prosecution, Voorhaar's sanction operated as a concrete assurance that the rest of the defendants would be shielded from criminal repercussions by the cloak of state protection. This in turn meant that the St. Mary's County Sheriff Department "did more than adopt a passive position" towards the seizure, *Chestnut Ridge*, 218 F.3d at 342 (quoting *Skinner v. Ry. Labor Executives' Ass'n.*, 489 U.S. 602, 615 (1989)), and instead gave "significant encouragement" to its perpetrators. *Mentavlos v. Anderson*, 249 F.3d 301, 311 (4th Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 52).

Additionally, the deputies' identities as state officers played a role at several points during the seizure itself. They were recognized as police officers by store employees throughout the county. They were carrying their state-issued firearms, and some of those firearms were visible during the evening. And one of them was wearing a Fraternal Order of the Police sweatshirt. It is no surprise, then, that at least one clerk was intimidated into selling his entire run of newspapers by the deputies' authority as state officials. When the deputies first tried to buy all the papers, he said "y'all can't do that because other people want to read them." The clerk later testified, however, that while the deputies made no explicit threats, "they basically came off real intimidating" and "made it real apparent . . . if I didn't sell it to them, then they could make my life here a living hell. . . . [I]t wouldn't be that hard [for them] to set [me] up for something." *Cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) (noting that "[p]eople do not lightly disregard public officers' thinly veiled threats").

The effect of a police presence on a store owner or clerk is not hard to imagine. Proprietors of small stores often feel a keen need to stay on the right side of local law enforcement. They depend heavily on prompt responses by the police to their calls, as well as on freedom from harassment and other unnecessary difficulties with the police. *See, e.g.*, *Turner v. Dammon*, 848 F.2d 440, 442-43, 445-47 (4th Cir.

1988). The 7-Eleven policy of giving free coffee and soft drinks to sheriff's deputies, for example, is driven by a desire for good relations with the local police. The strength of this interest is amply confirmed by the willingness of the convenience stores in this case to sell their entire run of newspapers to the police at one stroke, even to their potential economic detriment. Running out of newspapers risked offending other customers and cutting off a significant flow of ancillary business: a major reason to sell newspapers is to attract customers into the store in the first place, thereby leading them to buy other items that they otherwise might not have purchased there.

In sum, the nexus between defendants' actions and the state arose from more than just defendants' desire to still criticism of their public performance. Their status as sheriff's deputies enabled them to execute their scheme in a manner that private citizens never could have.

C.

Finally, both the First Amendment and 42 U.S.C. § 1983 exist in significant part to deter the kind of misdeeds perpetrated by defendants on election day. The First Amendment was drafted in the context of a lengthy history of censorship carried out by private organizations with complicated ties to the state apparatus and compelling motives to suppress speech unfavorable to the Crown. The Stationers' Company was a private guild of printers with its origins in medieval England; it was granted valuable monopolies and privileges by the government. Fredrick Seaton Siebert, *Freedom of the Press in England, 1476-1776*, at 64-66, 135 (1952). In exchange for the assurance of this valued status, the Stationer's Company acted as a vigorous censor, searching printing houses both for material which violated the Company's own monopolistic privileges and for material considered dangerous to the Crown. *Id.*; *see also* Cyprian Blagden, *The Stationers' Company: A History, 1403-1959*, at 20-21, 32-33 (1960). The drafters of the First Amendment knew full well that censorship is equally virulent whether carried out by official representatives of the state or by private individuals acting out of a self-interested hope in receiving or maintaining benefits from the state. Historical experience flatly belies defendants' argument that the First Amendment cannot apply to their censorial seizure because they were not wearing state uniforms.

Similarly, defendants' conspiracy bears many of the hallmarks of the civil rights violations that prompted the passage of § 1983. That statute was enacted principally to deal with conspiracies between local law enforcement officers and private individuals — typically via the Ku Klux Klan — to violate the rights of former slaves. The supporters of 42 U.S.C. § 1983 saw a criminal justice system "under the control of those who are wholly inimical to the impartial administration of law and equity," and asked "[w]hat benefit would result from appeal to . . . officers [who] are secretly in sympathy with the very evil against which we are striving?" Cong. Globe, 42d Cong., 1st Sess. 394 (1871) (statement of Rep. Rainey). *see also Monroe v. Pape*, 365 U.S. 167, 171-87 (1961). Congress had no doubt about the complicity of those who in their official capacities promoted the subterfuge of private arrangements to accomplish constitutionally impermissible ends. Indeed, "without concert, understanding, and arrangement," it "could not be possible that all should be acquitted who were arrested. It could not happen that in some localities a vast number of these crimes were committed and no one arrested. . . . These things do not occur thus accidentally." Cong. Globe, 42d Cong., 1st Sess. 459 (1871) (statement of Rep. Coburn). The whole purpose of the Ku Klux Klan Act was to prevent public authorities from violating constitutional rights through the use of nominally private means. Whether the rights be those of small papers and their readers or those of freedmen is not dispositive. The unlawfulness of private infringement of those rights under color of state law remains the same.

We would thus lose sight of the entire purpose of § 1983 if we held that defendants were not acting under color of state law. Here, a local sheriff, joined by a candidate for State's Attorney, actively encouraged and sanctioned the organized censorship of his political opponents by his subordinates, contributed money to support that censorship, and placed the blanket of his protection over the perpetrators. Sheriffs who removed their uniforms and acted as members of the Klan were not immune from § 1983; the conduct here, while different, also cannot be absolved by the simple expedient of removing the badge.[3]

---

[3]Plaintiffs' motion for summary judgment on the "color of law" issue is inextricably intertwined with defendants' summary judgment motion

IV.

The incident in this case may have taken place in America, but it belongs to a society much different and more oppressive than our own. If we were to sanction this conduct, we would point the way for other state officials to stifle public criticism of their policies and their performance. And we would leave particularly vulnerable this kind of paper in this kind of community. Alternative weeklies such as *St. Mary's Today* may stir deep ire in the objects of their irreverence, but we can hardly say on that account that they play no useful part in the political dialogue. No doubt the public has formed over time its opinion of the paper's responsibility and reputation. If defendants believed its attacks to be scurrilous, their remedy was either to undertake their own response or to initiate a defamation action. It was not for law enforcement to summon the organized force of the sheriff's office to the cause of censorship and dispatch deputies on the errands of suppression in the dead of night.

The judgment of the district court is therefore reversed and the case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

on that same question, because they each rest on identical factual and legal issues. The First Amendment inquiry is likewise inextricably intertwined with defendants' summary judgment motion, since the same retaliatory suppression of core political speech lies at the heart of each. *See Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 50-51 (1995) (appellate courts may review issues that are "inextricably intertwined" with another issue properly on appeal). However, the questions of qualified immunity, municipal liability, the extent to which defendant's conduct is actionable under the Maryland Constitution and Maryland common law, and the extent to which defendant Alioto participated in the seizure have not been fully briefed by the parties and have not been shown to be inextricably intertwined with the issue properly before the court as required by *Swint*. These issues must be addressed by the district court on remand.