Filed: August 14, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 02-1842
(CA-00-178-1)

Christopher H. Lyon,

Plaintiff - Appellee,

versus

United States of America,

Defendant - Appellant.

O R D E R

Upon consideration of the government's motion to correct errata and to publish the opinion,

IT IS ORDERED that the motion to publish is denied.

IT IS FURTHER ORDERED that the motion to correct errors is granted, and the court amends it opinion filed July 1, 2003, as follows:

On page 5, first paragraph, line 28 -- the date is corrected to read "November 15, 1996."

On page 5, first full paragraph, line 4 -- the date is corrected to read "March 12, 1996."

On page 10, first full paragraph, line 11 -- "nearly $50,000" is corrected to read "exceeding $50,000."

For the Court

/s/ Patricia S. Connor

Clerk

UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTOPHER H. LYON,
    *Plaintiff-Appellee,*

    v.

UNITED STATES OF AMERICA,
    *Defendant & Third Party Plaintiff-*         No. 02-1842
    Appellant,*

    v.

HENRY H. LYON,
    *Third Party Defendant.*

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
Glen M. Williams, Senior District Judge.
(CA-00-178-1)

Argued: April 3, 2003

Decided: July 1, 2003

Before WILLIAMS and MICHAEL, Circuit Judges, and
Terry L. WOOTEN, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Paula Keyser Speck, Tax Division, UNITED STATES
DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.

Daniel Robert Bieger, COPELAND & BIEGER, P.C., Abingdon, Virginia, for Appellee. **ON BRIEF:** Eileen J. O'Connor, Assistant Attorney General, John L. Brownlee, United States Attorney, Gary R. Allen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

In March 1999 the Internal Revenue Service assessed Christopher Lyon (Lyon) under I.R.C. § 6672 for $338,451.46 in trust fund taxes owed by North Branch Coal Company, Inc. (North Branch). Lyon was North Branch's president and secretary-treasurer, its sole shareholder, and its sole director. After paying $500.00 in partial satisfaction of the assessment, Lyon brought a suit for a refund in the U.S. District Court for the Western District of Virginia, claiming that he is not a person responsible for payment of taxes under § 6672. The United States counterclaimed for the balance of the assessment and filed a third-party complaint against Henry Lyon, Christopher Lyon's father and the alleged power behind the North Branch operation. The district court entered a default judgment against Henry Lyon on June 27, 2001. The United States and Christopher Lyon then filed cross motions for summary judgment. The district court denied the United States's motion and granted summary judgment to Lyon after concluding that Lyon was not the party responsible for the payment of North Branch's tax liability. For the reasons that follow, we reverse the district court's grant of summary judgment to Lyon and remand with instructions to enter summary judgment in favor of the United States.

I.

North Branch is a mining corporation organized under Virginia laws. North Branch's mining operations were carried out under a sub-

2

contract with Consolidation Coal Company (Consol), J.A. 544, and were conducted under a collective bargaining agreement with the United Mine Workers of America (UMWA), as required by the union's contract with Consol. J.A. 643-44, 544-45. Under the terms of that agreement, North Branch could not maintain its affiliation with the union, or its contract with Consol, if any of its officers or shareholders were affiliated with non-union operations. *Id.* Black Gold Leasing Corp. (Black Gold) is a corporation owned by Jerry Tackett and Danny Blankenship, and Henry Lyon had some (never-specified) "interest" in the corporation. J.A. 535-36, 624-27, 664-65. Black Gold does not have a collective bargaining agreement with the UMWA. In December 1994 Black Gold arranged to buy North Branch's equipment from North Branch's sole shareholder and then lease it back to North Branch. J.A. 624-25, 629-30, 633, 656-57, 665. To avoid breaking North Branch's agreement with the UMWA, the Black Gold group had Michael Adkins, North Branch's mining superintendent, acquire North Branch's stock. J.A. 537-39, 645. Adkins did so, apparently paying for the stock, and thereafter became North Branch's sole shareholder and president. J.A. 466-68, 538, 540-41. In April 1995 Adkins assigned his North Branch stock to Joyce Kretzer, Henry Lyon's secretary. Kretzer became North Branch's president and secretary-treasurer. J.A. 466-68, 525, 540-41. During that time Kretzer handled the payroll, prepared federal employment tax returns, and completed other administrative tasks for North Branch. J.A. 465-66, 478-80, 485-87. Tackett, Blankenship, and Henry Lyon assumed de facto direction over North Branch's operations during Kretzer's tenure as president. J.A. 541-42. At no time, however, were any of these men shareholders, directors, officers, or (according to company records) employees of North Branch. J.A. 630, 666. Henry Lyon referred to Kretzer as a "title holder" only, J.A. 541, but she exercised her authority to pay North Branch's withholding taxes to the government, over the objections of Tackett, Blankenship, and Henry Lyon. J.A. 497. She continued to pay such taxes until the three men took the company checkbook away from her and asked her to resign her position and relinquish her stock. J.A. 481-83, 491-94, 545-46. Despite the fact that Kretzer paid the withholding taxes, Henry Lyon testified that the authority to pay the taxes rested with him, Tackett, and Blankenship. J.A. 545.

On December 31, 1995, at the direction of Henry Lyon, Blankenship, and Tackett, Kretzer assigned her North Branch stock to Chris-

3

topher Lyon for no consideration. J.A. 473, 481-82, 512-13, 519-21. At that time Lyon lived at home with his father and had recently graduated with a bachelor's degree in business administration from Transylvania University in Kentucky. J.A. 154-55. Lyon was twenty-two years old when he assumed his North Branch responsibilities. J.A. 326. On January 1, 1996, Lyon appointed himself sole director of North Branch. J.A. 499, 524. On January 21, 1996, he accepted Kretzer's resignation as president and secretary-treasurer and took those offices himself. J.A. 500, 516, 546. He remained the president, secretary-treasurer, sole director, and sole shareholder of North Branch until the company ceased operations in the spring of 1997. J.A. 246-47, 252-53. As president of North Branch, Lyon received a biweekly salary of $500.00, plus a monthly check based on the amount of coal mined by the company. J.A. 194. He was paid $35,888.01 in 1996 and $15,989.43 in 1997. J.A. 191-97, 312-19. According to North Branch's bylaws, the president has "supervision of the affairs of the Corporation" and "shall sign all certificates of stock" and "shall sign or counter-sign all contracts and other instruments of the Corporation." J.A. 84. The Secretary "shall have charge of the seal and of the corporate books." *Id.* It appears that there was only one other officer for North Branch, a Vice-President of Operations, whose sole responsibility was to direct mining operations at the mine site. The Vice-President of Operations had no authority to make financial decisions. J.A. 514.

Despite Lyon's various roles in the corporation, he claims to have only done as he was told by his father. Henry Lyon testified that all corporate authority rested with him, Tackett, and Blankenship. J.A. 549. Specifically, Henry Lyon testified that his son lacked authority over general decision-making and management of the corporation, over decisions about which creditors or vendors would be paid, and over whether withholding taxes would be paid. *Id.* Lyon spent little time in the business offices and devoted little time to corporate duties. J.A. 281-84. He did, however, perform tasks such as delivering the payroll. J.A. 174. And, when necessary Lyon carried out numerous corporate tasks, such as accepting the resignation of the Vice President of Operations and appointing a new one, signing the corporation's annual reports, and signing federal tax returns. J.A. 505-06, 682-83, 162-63, 294-95, 105, 107, 246, 350. For instance, Lyon accepted the resignation of Ricky Sloane as Vice President on Sep-

4

tember 30, 1996, and appointed Steve Vinson to that post. J.A. 505-06, 526. On March 8, 1996, and March 26, 1997, Lyon signed North Branch's 1996 and 1997 annual reports to the Virginia State Corporation Commission. On July 10, 1996, and January 31, 1997, he signed North Branch's Employer's Quarterly Federal Tax Return (Form 941) for the second and fourth quarters of 1996, respectively. J.A. 261, 402. His signature also appears on Form 941s for the first quarter of 1996 and the first quarter of 1997. J.A. 348, 400. And on January 31, 1997, he signed North Branch's 1996 Employer Annual Federal Unemployment Tax Return. J.A. 246. According to Lyon, he signed documents when told to do so and did not read what he was signing. "I mean I signed so many things. . . . [T]o be honest with you, I've never really read anything that I did sign. Like I told you before, . . . the little hot pink post-it [sic] notes were there and if they said sign here, I would just sign and, and turn the page and go on." J.A. 200. Lyon also executed a number of documents between North Branch and its bank, First Sentinel. Lyon was an authorized signatory on North Branch's checking account at First Sentinel and was authorized to conduct all banking business for the corporation, including opening accounts, withdrawing funds, executing promissory notes, borrowing money, and pledging corporate assets as security for loans. J.A. 510-11, 527-28, 201-08. On February 16, 1996, Lyon executed a credit agreement with the bank, under which North Branch received a $200,000 line of credit for three months. J.A. 211-13, 284-85. He also executed a security agreement, personal guaranty, and promissory note in connection with the line of credit. J.A. 213-19, 284-85, 328-32. He executed extensions of the line of credit on May 17, August 17, and November 15, 1996, and effectively extended it through February 15, 1997, for a total credit line of $1,919,000. J.A. 227-29, 346.

Lyon and an accountant retained by North Branch met on three occasions with IRS Revenue Officer Hunter to discuss North Branch's failure to pay its employment tax liabilities. J.A. 27-29, 261-64, 275-76, 610-14. At the first meeting on March 12, 1996, Hunter explained that the delinquent taxes amounted to approximately $78,000 and that they were due by April 30. J.A. 27-28. Hunter also informed Lyon that the taxes were mandatory and explained enforcement policies. J.A. 28. Hunter specifically warned Lyon that the IRS could make an assessment against him under I.R.C. § 6672 as North Branch's president. *Id.* Lyon said that he understood and promised to

5

pay the taxes promptly. J.A. 28-29. North Branch did not pay the taxes, however, and Lyon met again with Hunter on May 22, 1996. J.A. 29, 41. When North Branch still failed to pay, Hunter met with Lyon again on November 21, 1996. J.A. 32, 47. Hunter prepared a record of the meeting, which Hunter and Lyon both signed. J.A. 80. Lyon has not explained why he did not take steps to pay the back employment taxes except to say that his father was willing to accept "the blame for all of this because obviously I had nothing to do with it, that I was just put in as president, quote unquote." J.A. 183. According to Lyon, he simply did what his father told him to do because he had "been taken very well care of by [his father] through-out [his] life." J.A. 174. Henry Lyon explained that his son did not know where the checkbook was and further claimed that his son would never have gone to the bank to obtain a certified check payable to the IRS. J.A. 568-69.

On March 1, 1999, the IRS assessed Lyon under I.R.C. § 6672 for $338,451.46 in trust fund taxes owed by North Branch for 1996 and the second quarter of 1997. Lyon paid $500.00 and then brought suit for a refund. The government counterclaimed for the balance of the assessment and also filed a third-party complaint against Henry Lyon. A default judgment was entered against Henry Lyon on June 27, 2001. As of November 2002 no payments had been made on that judgment. The parties then filed cross-motions for summary judgment. The district court granted Lyon's motion and denied the government's, concluding that Lyon lacked actual authority within the business and thus was not a party responsible for payment of North Branch's taxes under § 6672. The government now appeals.

## II.

We review a district court's summary judgment determination de novo. *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002). Summary judgment is appropriate only where there is no factual dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When faced with cross motions for summary judgment, the court must review each motion separately on its own merit to determine whether either of the parties deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003). "When considering

6

each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (internal quotations marks and citation omitted). The non-moving party may not rely upon mere allegations but must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Cray Communications, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994). If the non-moving party fails to respond, summary judgment, if appropriate, will be entered. *See* Fed. R. Civ. P. 56(e). "[W]hen an appeal from a denial of summary judgment is raised in tandem with an appeal of an order granting a cross-motion for summary judgment, we have jurisdiction to review the propriety of the denial of summary judgment by the district court." *Monahan v. County of Chesterfield*, 95 F.3d 1263, 1265 (4th Cir. 1996) (internal quotation marks and citation omitted). *See also Podberesky v. Kirwan*, 38 F.3d 147, 157 (4th Cir. 1994). In this case the government appeals the district court's grant of summary judgment to Lyon and the denial of summary judgment to the United States.

### III.

The Internal Revenue Code requires employers to withhold federal social security, hospital insurance, and income taxes from the wages of their employees and to turn over the withheld amounts to the United States. *See* I.R.C. §§ 3102(a), 3402(a). The withheld taxes constitute a special fund held in trust for the benefit of the United States. *See* I.R.C. § 7501; *see also Begier v. IRS*, 496 U.S. 53, 60-62 (1990). "These trust fund taxes are for the exclusive use of the government and cannot be used to pay business expenses of the employer, including salaries." *Brewery, Inc. v. United States*, 33 F.3d 589, 593 (6th Cir. 1994) (internal quotation marks and citation omitted). If an employer withholds the taxes but fails to remit them to the government, the employee is nevertheless credited with the payment. *Slodov v. United States*, 436 U.S. 238, 243 (1978). Unless the government can recover the withheld taxes, however, the taxes are lost. To protect against such revenue losses, I.R.C. § 6672 imposes personal liability for the amount of taxes due upon those officers or agents of the employer who are responsible for the default. *See Slodov*, 436 U.S. at 246-50; *Plett v. United States*, 185 F.3d 216, 218 (4th Cir.

7

1999). Section 6672 has been broadly construed to allow the government to reach those responsible for a corporation's failure to pay withholding taxes. *See O'Connor v. United States*, 956 F.2d 48, 50 (4th Cir. 1992).

Section 6672(a) provides that "[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails" to do so shall be liable for "a penalty equal to the total amount of the tax" withheld from the government. Section 6672 thus imposes personal liability for an employer's unpaid withholding taxes on wages paid to its employees on any person (1) who is responsible for collecting and paying such withholding taxes over to the government and (2) who willfully fails to see that those taxes are paid. *Plett*, 185 F.3d at 218; *O'Connor*, 956 F.2d at 50. Once assessed for such a liability, the taxpayer has the burden of proof on both elements of § 6672 liability. *O'Connor*, 956 F.2d at 50. In this case the district court concluded that the government presented insufficient evidence to establish that Christopher Lyon was a person responsible for collecting and paying North Branch's withholding taxes. J.A. 714. Because the district court concluded that the government could not meet the first requirement for establishing a taxpayer's liability under § 6672, the court did not reach the question of whether Lyon willfully failed to see that those taxes were paid. We address each issue in turn.

### A.

Courts refer to an individual who falls under § 6672 as a "responsible person." In *Plett* we emphasized that even though a determination of whether an individual qualifies as a "responsible person" under § 6672 is largely fact-based, summary judgment is appropriate where, in the absence of a dispute over material facts, it is clear as a matter of law that the taxpayer is a "responsible person" under the statute. *Plett*, 185 F.3d at 223. The "key element" for determining whether someone is a responsible person "is whether that person has the *statutorily imposed duty* to make the tax payments." *O'Connor*, 956 F.2d at 51 (emphasis added). That duty "is considered in light of the person's authority over an enterprise's finances or general decision making." *Id.* Such authority "is generally found in high corporate officials charged with general control over corporate business affairs who participate in decisions concerning payment of creditors and disburse-

8

ment of funds." *Id.* That said, a party is not presumed to be a "responsible person" based on title alone. *Id.* The focus is "on substance rather than form." *Id.* "The substance of the circumstances must be such that the officer exercises and uses his authority over financial affairs or general management, *or is under a duty to do so*, before that officer can be deemed to be a responsible person." *Id.* (emphasis added).

We have developed a list of factors to guide us in determining whether the substance of the circumstances is sufficient to create § 6672 liability: (1) whether the individual is an officer; (2) whether the individual has control over the payroll; (3) whether the individual determines which creditors to pay or not pay; (4) whether the individual is responsible for the day-to-day operations of the corporation, including its financial affairs; (5) whether the individual has the power to sign checks and in fact does so; and (6) whether the individual has the ability to hire and fire employees. *See Plett*, 185 F.3d at 222; *O'Connor*, 956 F.2d at 51. Other courts look to similar factors for determining whether an individual is a responsible person under § 6672. *See, e.g.*, *United States v. Landau*, 155 F.3d 93, 100-01 (2d Cir. 1998); *United States v. Kim*, 111 F.3d 1351, 1362-63 (7th Cir. 1997); *Barnett v. IRS*, 988 F.2d 1449, 1455 (5th Cir. 1993). In evaluating a person's status under these factors, the critical inquiry is "whether the person had the `effective power' to pay the taxes—that is, whether he had the actual authority or ability, in view of his status within the corporation, to pay the taxes owed." *Vinick v. United States*, 205 F.3d 1, 8 (1st Cir. 2000) (quoting *Barnett*, 988 F.2d at 1454). *See also Kim*, 111 F.3d at 1362 (whether the "individual could have impeded the flow of business to the extent necessary to prevent the corporation from squandering the taxes it withheld from its employees") (internal quotation marks and citation omitted); *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir. 1992) (whether the person is "connected closely enough with the business to prevent the default from occurring"); *Johnson v. United States*, 203 F. Supp. 2d 416, 422 (D. Md. 2002).

When the *Plett/O'Connor* factors are applied to this case, the following undisputed facts come to the front. Lyon was not only an officer of North Branch, he was its president, secretary-treasurer, and sole director and shareholder. Under Virginia corporate law and under

9

North Branch's bylaws, Lyon had the authority to supervise the affairs of the corporation and to sign and counter-sign contracts of the corporation. Lyon was, in fact, the only corporate officer with the authority to perform these tasks. The only other officer, the Vice President of Operations, had no authority over the corporation's finances. Lyon accepted the resignation of the first Vice President of Operations and, while it does not appear that Lyon actually chose the successor, Lyon formally appointed him. Lyon was a signatory on North Branch's bank account, and he signed the documentation for the corporation's credit agreement that ultimately extended almost $2,000,000 in credit to North Branch. Lyon in fact executed a personal guaranty and promissory note in connection with the line of credit. He routinely signed corporate reports and corporate tax forms. In sum, as the district court recognized, Lyon " *did have the capacity* to authorize checks and run the financial aspects of the company." J.A. 708 (emphasis added). It is true, however, that Lyon did not oversee the payroll, make determinations about which creditors to pay or not pay, or engage in the day-to-day operations of the corporation. Nonetheless, in light of his many roles within the corporation — president, secretary/treasurer, sole director, and sole shareholder — Lyon legally *could* have assumed such corporate responsibilities. It is clear from the undisputed facts in the record that Lyon had the authority, if he had chosen to exercise it, to take any and all of the actions listed among the *Plett/O'Connor* factors. It is equally clear, however, that Lyon only exercised his authority at the direction of his father. The district court concluded that under these unique circumstances Lyon was relieved of liability under § 6672. We disagree.

In this case, the critical question is whether someone like Lyon, who clearly controls the corporation on paper and who exercises authority over matters such as check-signing, loan procurement, and hiring and firing but who does so at the direction of others, is a "responsible person." The parties agree that Lyon was essentially a puppet of his father and that Lyon performed his duties as president and sole director of North Branch at the direction of Henry Lyon. Clearly, the senior Lyon was running the show. But that is not necessarily enough to permit the younger Lyon to shirk his statutorily imposed duties to North Branch, particularly where he obtained benefits, exceeding $50,000, for assuming such responsibilities. This circuit's case law emphasizes that persons such as Lyon, with statutorily imposed

10

duties for the financial operations of a corporation, are more often than not "responsible persons." We, along with other courts, look at whether or not the person in question has the "power to compel or prohibit the allocation of corporate funds." *Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed. Cir. 1984). Where persons have authority to sign a corporation's checks or to prevent their issuance by denying a needed signature or where persons control the voting stock of a corporation, they are generally held to be "responsible." *Id.* Moreover, when a taxpayer claims, such as Lyon does, that he has only technical but not actual authority, the taxpayer retains the burden of showing "that actual authority was in reality more limited than technical authority, and if the individual fails" to show a genuine dispute of material fact on this issue, we may "conclude that the documentary evidence of authority reflects the reality." *Landau*, 155 F.3d at 103. *See also United States v. Rem*, 38 F.3d 634, 644-45 (2d Cir. 1994).

During his tenure as corporate officer and sole director and shareholder of North Branch, Lyon possessed sole legal authority to direct the financial operations of the corporation. At any time, he could have paid the trust fund taxes without needing further authorization. It is true that his father and the two other men involved might have been displeased, but these three individuals could not legally have prevented Lyon from making the payments. The evidence does not reflect that these three had any legal or official role in North Branch's affairs, and they have not suggested otherwise; they simply assert that they made all of the corporation's decisions. The fact that Kretzer, during her tenure as president, did pay the taxes indicates that Lyon could have done so had he chosen. That Kretzer was asked to step down because she insisted on paying the taxes does not indicate that she could have been forced to step down. She held all the legal cards, as did Lyon once he assumed her role. Lyon has offered no evidence to show that he was in any way prevented from carrying out his authority to pay the taxes. He was not incapacitated in any way, nor was he under any kind of threat. *Cf. Howard v. United States*, 711 F.2d 729, 734 (5th Cir. 1983) (finding that the fact that the plaintiff might have been fired had he disobeyed instructions and paid the taxes does not make him any less responsible for their payment). While Lyon's father might have called the shots, his father could not legally have stopped Lyon from acting for the corporation — at least not based on the facts proffered by Lyon. Lyon bears the burden of

11

showing that his "paper authority" could not translate into actual authority. The fact that he chose not to exercise his legal authority is not enough to show that he had no actual authority.

In light of the foregoing, we conclude that the undisputed evidence shows that Lyon possessed the actual authority to direct the financial operations of North Branch and to pay the taxes should he have chosen to do so. The onus was on Lyon to demonstrate that he was prevented from exercising this authority. He has not done so. He certainly demonstrated that his father controlled the operations of the corporation. But Lyon has not demonstrated that his father actually prevented him, or that he could have prevented him, from paying the taxes if Lyon had attempted to do so. Lyon's statement that he thought his father would take care of things falls short of the mark. "[C]asting a wide net of responsibility under § 6672 serves the important prophylactic purpose of encouraging all those with authority to stay abreast of a company's tax withholding and payment obligations." *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993). Absolving Lyon in a situation such as this one would essentially create a loophole in which willful tax evaders could simply place the entire corporate control in the hands of a puppet who has authority on paper but not in practice. While he may not have been running the day to day operations of North Branch, Lyon had a responsibility to monitor North Branch's finances. *See Barnett*, 988 F.2d at 1457 ("[W]e believe that not only is it a bad business practice for a high-level company official such as [Lyon] to fail to monitor his company's finances, it also subjects him to being held a responsible party under § 6672."). We conclude that the government has presented undisputed evidence sufficient to establish as a matter of law that Lyon was a "responsible person" under § 6672.

## B.

We turn now to the question of whether the government offers undisputed evidence sufficient to establish as a matter of law that Lyon willfully failed to pay the withheld taxes. In this case the district court never reached the question of "willfulness." We may nonetheless decide an issue without resorting to remand when the facts with respect to the particular issue are not in dispute. *Monahan*, 95 F.3d at 1265. In this case the government proffered evidence of willfulness

12

in support of its motion for summary judgment. Lyon had the opportunity to offer evidence to the contrary but chose instead to argue to the district court and on appeal that "he had no actual authority over the corporation's activities . . . [and could not] willfully fail to do something that [he] has no authority to do." Appellee's Br. at 32. We are left then to determine whether the government's uncontested evidence is sufficient to establish "willfulness" as a matter of law. *See* Fed. R. Civ. P. 56(e).

The "willful" failure to pay trust fund taxes requires either "knowledge of nonpayment or reckless disregard of whether the payments were being made." *Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992) (internal quotation marks and citation omitted). It is undisputed that Lyon was aware of the overdue taxes. He met on three occasions with IRS Revenue Officer Hunter, who repeatedly informed Lyon of the unpaid taxes and explained the consequences of a continued failure to pay. Lyon knew that he could be held personally responsible for the unpaid taxes and, in fact, promised to make payments but never did so. During the time period in question, the corporation had access to funds to pay the taxes, but the funds were used to pay other creditors instead. *Cf. id.* ("The intentional preference of other creditors over the United States is sufficient to establish the element of willfulness under section 6672(a).") (internal quotation marks and citation omitted). Even viewing the evidence in the light most favorable to Lyon, we conclude that the record allows no conclusion other than that the failure to pay the taxes was willful on Lyon's part.

C.

In sum, we conclude that the district court erred in concluding that "Chris Lyon was not the party responsible for the payment of North [Branch]'s tax liability." J.A. 714. Rather, we conclude that the government has proffered evidence sufficient to establish as a matter of law that Lyon was a "responsible person" under § 6672. We further conclude that the government proffered evidence sufficient to establish as a matter of law that Lyon "willfully" failed to see that the withholding taxes were paid. Accordingly, the government has established as a matter of law that personal liability may be imposed upon Lyon under § 6672 for North Branch's unpaid withholding taxes.

13

IV.

For all of the foregoing reasons, we reverse the district court's grant of summary judgment to Lyon and remand to the district court with instructions that summary judgment be entered in favor of the United States.

*REVERSED AND REMANDED*

14