UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

No. 13-1194

───────────

MILLENNIUM INORGANIC CHEMICALS LTD.; CRISTAL INORGANIC
CHEMICALS LIMITED,

Plaintiffs - Appellees,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; ACE
AMERICAN INSURANCE COMPANY,

Defendants - Appellants.

───────────

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Ellen L. Hollander, District Judge.
(1:09-cv-01893-ELH)

───────────

Argued: December 12, 2013      Decided: February 20, 2014

───────────

Before NIEMEYER, AGEE, and WYNN, Circuit Judges.

───────────

Reversed and remanded by published opinion. Judge Agee wrote
the opinion, in which Judge Niemeyer joined. Judge Wynn wrote a
dissenting opinion.

───────────

**ARGUED:** Charles Glaston Cole, STEPTOE & JOHNSON, LLP,
Washington, D.C., for Appellants. Joseph Lanham Beavers, MILES
& STOCKBRIDGE P.C., Baltimore, Maryland, for Appellees. **ON
BRIEF:** Jonathan D. Hacker, O'MELVENY & MYERS LLP, Washington,
D.C., for Appellant ACE American Insurance Company. Roger E.
Warin, STEPTOE & JOHNSON LLP, Washington, D.C., for Appellant
National Union Fire Insurance Company of Pittsburgh, PA. John
C. Mezzacappa, Hilary M. Henkind, MOUND COTTON WOLLAN &

GREENGRASS, New York, New York, for Appellants.  Gary C. Duvall, Jeffrey P. Reilly, John C. Celeste, MILES & STOCKBRIDGE P.C., Baltimore, Maryland, for Appellees.

———————

AGEE, Circuit Judge:

National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and ACE American Insurance Co. ("ACE" and together with National Union, the "Insurers") appeal from the district court's grant of partial summary judgment in favor of Millennium Inorganic Chemicals Ltd. and Cristal Inorganic Chemicals Ltd. (collectively, "Millennium"). Millennium sued the Insurers in the United States District Court for the District of Maryland, contending that the Insurers had wrongfully denied Millennium's claim for coverage under contingent business interruption provisions of commercial liability insurance policies issued by the Insurers. The district court granted partial summary judgment in favor of Millennium after concluding that certain terms in the policies were ambiguous and that the doctrine of <u>contra proferentem</u> therefore applied. For the reasons set forth below, we reverse the judgment of the district court and remand for entry of summary judgment in favor of the Insurers.

I

A    The Insurance Policy Provisions

In 2008, Millennium enlisted the help of Marsh USA, Inc. ("Marsh"), an insurance brokerage firm, to secure a commercial liability insurance policy including contingent business

3

interruption ("CBI") insurance coverage.[1] Marsh solicited bids from a number of insurers, including National Union and ACE, seeking CBI coverage and outlining the coverage specifications Millennium sought, specifically stating only that it required coverage "for direct suppliers/customers." (J.A. 1193.) In response, National Union's quote provided, "THERE SHALL BE NO COVERAGE FOR INDIRECT SUPPLIERS/RECIPIENTS." (J.A. 1209.) ACE also offered a quote, providing policy limits only for "direct" suppliers. (J.A. 1217.)

Millennium chose to purchase its commercial coverage, including the CBI endorsement, from National Union and ACE, each of which would bear responsibility for 50% of Millennium's covered losses, up to specified limits. As pertinent to the CBI coverage, National Union issued a Binder of Insurance (a "Binder"), which stated, "THERE SHALL BE NO COVERAGE FOR INDIRECT SUPPLIERS/RECIPIENTS." (J.A. 1289.) The National Union Binder also provided a sublimit on liability for "DIRECT CONTRIBUTING OR RECIPIENT PROPERTY(IES)." (J.A. 1287.) Likewise,

---

[1] Generically, business interruption insurance coverage protects the insured party against losses stemming from unexpected interruptions of normal business operations resulting from damage to property caused by a covered hazard. 11 Steven Plitt et al., Couch on Insurance 3d § 167:9 (2013). A subset of business interruption coverage, termed CBI coverage, protects against business losses caused by damage to property not owned by the insured party. Id. § 167:14. The only provision of the policies at issue in this case concerns the CBI coverage.

4

ACE issued a Binder that provided a similar sublimit on "'Direct' Contingent Time Element[s]." (J.A. 1305.) Neither Binder provided any coverage for "indirect" suppliers.

Shortly after issuing the Binders, National Union and ACE separately issued policies to Millennium (the "Policies") with essentially identical terms. Each policy included an Endorsement titled "CONTINGENT BUSINESS INTERRUPTION CONTRIBUTING PROPERTY(IES) ENDORSEMENT" (the "Endorsements"). (J.A. 1392, 1496.) The Endorsements insured Millennium against certain losses resulting from the disruption of the supply of materials to Millennium caused by damage to certain "contributing properties."[2] (J.A. 1392, 1496.) Specifically, Section C of the Endorsements defined events of coverage as insurance

> only against loss directly resulting from
> necessary interruption of business conducted
> on premises occupied by [Millennium], caused
> by damage to or destruction of any of the
> real or personal property described above
> and referred to as CONTRIBUTING

---

[2] The term "contributing properties" means "the insured's prime suppliers of materials, parts and services. If the insured depends upon one or, at most, a few manufacturers or suppliers for the bulk of materials and supplies necessary to conduct its business operations, then these suppliers are said to be contributing properties." Insuring Real Property § 3.03[2] (Stephen A. Cozen ed. 2013); (see J.A. 1707). Consistent with this industry definition, the Endorsements define "contributing property" by reference to the policy schedules, which state that covered locations "must be direct suppliers of materials to [Millennium's] locations." (J.A. 1392, 1496.) The parties in this case use the term "contributing property" interchangeably with the term "supplier." (See, e.g., Response Br. 27 n.12.)

> PROPERTY(IES) and which is not operated by [Millennium], by the peril(s) insured against during the term of this Policy, which wholly or partially prevents the delivery of materials to [Millennium] or to others for the account of [Millennium] and results directly in a necessary interruption of [Millennium's] business.

(J.A. 1392, 1496.) "Contributing Properties" in Section C of the Endorsements was thus defined by reference ("described above") to the preceding Section B, which establishes that only a "direct supplier of materials to the Insured's locations" can be a "contributing property." Section B provided a "SCHEDULE OF LOCATION(S)," (the "Schedules") in which Millennium could list any "contributing property" that created a risk of business interruption. (J.A. 1392, 1496.)

A general section of each of the Policies set policy sublimits and provided that any direct contributing properties named in the Schedules were covered for $25 million, while any unnamed direct contributing properties were covered for $10 million. Millennium did not list any contributing properties on the provided Schedules. The Endorsements also each contained a loss-mitigation provision requiring Millennium to "use [its] influence to induce the CONTRIBUTING PROPERTY(IES) to make use of any other machinery, equipment, supplies or location available in order to resume operations and delivery of materials to [Millennium]." (J.A. 1393, 1497.)

## B    Millennium's Coverage Claim

Millennium was in the business of processing titanium dioxide, a compound often used for its white pigmentation, at its processing facility in Western Australia. The energy source for Millennium's titanium dioxide processing operation was natural gas received through the Dampier-to-Bunbury Natural Gas Pipeline (the "DB Pipeline"), Western Australia's principal gas transmission pipeline. Millennium purchased the gas under a contract with Alinta Sales Pty Ltd ("Alinta"), a retail gas supplier. Alinta purchased the gas it offered for sale from a number of natural gas producers, one of which was Apache Corporation ("Apache").

As a natural gas producer, Apache extracted and processed natural gas from wells on Varanus Island, an island located off the coast of Western Australia. Once Apache processed the natural gas, it would inject the gas into the DB Pipeline, at which point custody, title, and risk passed from Apache to Alinta. The natural gas received from Apache's facility then comingled with that obtained from other producers, resulting in an amorphous mix of gas in a single pipeline.

Apache has no ownership interest in the DB Pipeline and does not own any downstream gas transmission or distribution facilities. Alinta retains sole ownership of the gas once it enters the DB Pipeline. Under Alinta's end-user contract with

7

Millennium, title to the gas passed to Millennium only at the time of delivery, i.e., when the gas left the DB Pipeline and was delivered to Millennium's facility by way of a separate delivery line. Millennium's contract for the purchase of natural gas was solely with Alinta. Millennium had no contract or business relationship with Apache, and the contract with Alinta made no reference to Apache. At the time period relevant to this appeal, Apache produced about 20% of the natural gas that Alinta sold.

On June 3, 2008, an explosion occurred at Apache's Varanus Island facility, causing its natural gas production to cease. Apache notified Alinta that the explosion caused it to shut down its operations and that there would be no gas supply from Varanus Island until further notice. Alinta, in turn, sent a notice of force majeure to Millennium and other customers. The Australian government quickly intervened and imposed controls prioritizing delivery of natural gas to domestic customers and essential services. As a result, Millennium's gas supply was curtailed, and it was forced to shut down its titanium dioxide manufacturing operations for a number of months.

Two days after the explosion, on June 5, 2008, Millennium sent notice of claim letters to National Union and ACE, seeking CBI coverage for its losses incurred when the titanium dioxide facility closed. The Insurers investigated Millennium's claim

8

and provided a detailed report explaining the Australian gas distribution system and concluding that Apache was not a direct supplier to Millennium. As a consequence, the Insurers determined there was no coverage under the Policies for Millennium's claim, but invited Millennium to provide evidence of a direct relationship between Millennium and Apache sufficient to establish policy coverage.

Millennium responded by asserting, inter alia, that Apache was a direct supplier to it because Alinta provided only a service, the delivery of natural gas, whereas Apache provided the actual material at issue. National Union reaffirmed its denial of Millennium's claim, contending that Alinta, and not Apache, was the only direct supplier of natural gas to Millennium. There was no further communication between the parties.

## C    Proceedings in the District Court

In July 2009, Millennium filed a complaint against the Insurers in the United States District Court for the District of Maryland, invoking the court's diversity jurisdiction.[3] Millennium requested a declaratory judgment regarding the rights

---

[3] Millennium also asserted several claims against Marsh, but voluntarily dismissed those claims pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure. Millennium's claims against Marsh are not at issue on appeal.

and liabilities of the parties with respect to the Policies. Further, Millennium asserted claims of breach of contract[4] and failure to act in good faith pursuant to section 3-1701 of the Maryland Courts and Judicial Proceedings Code.

After the close of discovery, Millennium moved for partial summary judgment on its declaratory judgment claim, arguing that the Policies unambiguously covered Millennium's loss because the Endorsements did not limit coverage to direct suppliers. The Insurers filed a joint cross-motion for summary judgment on Millennium's declaratory judgment and bad faith claims, contending that the Policies provided coverage only for direct suppliers and that Apache was not a direct supplier to Millennium. The Insurers also argued that Millennium failed to present any evidence in support of its bad faith claim.

The district court entered an order granting Millennium's motion for partial summary judgment, denying the Insurers' motion for summary judgment with respect to Millennium's declaratory judgment claim, and granting the Insurers' motion with respect to Millennium's bad faith claim. In an accompanying opinion, the district court reviewed and interpreted the

---

[4] Millennium's breach of contract claim was based upon the Insurers' refusal to cover Millennium's CBI losses arising out of the Varanus Island explosion, and Millennium asserts coverage only under the Endorsements. Thus, Millennium's breach of contract claim must rise or fall with its coverage claim.

10

Policies,[5] concluding that coverage under the Policies extended only to "direct contributing properties." In determining the meaning of the term "direct contributing property," the district court reviewed existing caselaw on CBI coverage.

The district court concluded that "the physical relationship between the properties is as or more important than the legal relationship between the properties' owners." (J.A. 1991.) The district court held that Millennium's contract with Alinta had "no effect on the physical realities of natural gas supply between [Apache] and [Millennium]" because, although Alinta took title to the gas when it traveled through the DB Pipeline, Alinta "never [took] physical possession of the gas and [had] no 'property' with which to do so." (J.A. 1991.)

---

[5] Finding that the Policies lacked choice of law provisions, the district court applied a Maryland choice of law analysis to determine which state's law applied to the construction of the Policies. See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009) (holding that federal courts exercising diversity jurisdiction "apply the choice of law rules of the forum state"). Millennium argued in favor of New Jersey law and the Insurers argued in favor of New York law. The district court concluded that, under a lex loci analysis, New York law would apply, but ultimately declined to reach a decision, reasoning that there was no meaningful difference in the common law regarding interpretation of insurance policies of either state. We need not perform a choice of law analysis on appeal because the parties now agree that there is no substantive difference between the applicable laws of New York and New Jersey with respect to the issues in this case, and each party cites to both New York and New Jersey caselaw. We therefore cite to the laws of both jurisdictions.

The district court then observed that "the policies do not define the term 'direct,'" and concluded that "the term 'direct' is ambiguous here, in the context of an entity that provides a direct physical supply of material to the insured, but has no direct contractual relationship with the insured." (J.A. 1993.) Although the parties presented extrinsic evidence to establish the meaning of "direct," the district court concluded that none of that evidence "speaks to the specific meaning the parties intended by the use of the word 'direct.'" (J.A. 1994.) In order to resolve the ambiguity, the district court applied the doctrine of contra proferentem[6] in favor of Millennium. Accordingly, the district court held that Apache qualified as a "direct" supplier to Millennium and that Apache's natural gas production facility was a "direct contributing property" within the meaning of the Policies "because Apache's facility physically provided a direct supply of natural gas to Millennium's premises, despite the fact that Apache and Millennium had no direct contractual relationship." (J.A. 1995.)

---

[6] When a court determines that a provision in an insurance contract is ambiguous and "extrinsic evidence does not yield a conclusive answer as to the parties' intent," the rule of contra proferentem provides that "where an insurer drafts a policy, 'any ambiguity in [the] . . . policy should be resolved in favor of the insured.'" Morgan Stanley Group Inc. v. New England Ins. Co., 225 F.3d 270, 276 (2d Cir. 2000) (quoting McCostis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir. 1994)).

12

As an alternative holding, the district court opined that the Endorsements also provided coverage for damage to contributing properties "'which wholly or partially prevents the delivery of materials to [Millennium] <u>or to others for the account of [Millennium]</u>.'" (J.A. 1995.) The district court then concluded that this provision was also ambiguous because it did not explain "who must hold the 'account of the Insured'—the one who delivers, or the 'others' to whom delivery is made." (J.A. 1998.) Based upon this ambiguity, the district court again applied the doctrine of <u>contra proferentem</u>, construing "the phrase ['for the account of'] in favor of coverage for the insured," Millennium. (J.A. 1998.)

After the district court granted Millennium's motion for partial summary judgment, the parties stipulated and agreed to the entry of judgment in favor of Millennium in the amount of $10,850,000, inclusive of pre-judgment interest, with the Insurers expressly preserving their right to appeal the judgment. The district court then entered final judgment against the Insurers in the stipulated amount, and the Insurers timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

II

We review a district court's grant of a motion for summary judgment de novo, construing all facts and reasonable inferences

13

in favor of the non-moving party. Crockett v. Mission Hosp., Inc., 717 F.3d 348, 350 n.1, 354 (4th Cir. 2013).

III

When interpreting insurance contracts, courts first look to the plain language of the provision at issue. See Fed. Ins. Co. v. Int'l Bus. Machs. Corp., 965 N.E.2d 934, 935 (N.Y. 2012); Chubb Custom Ins. Co. v. The Prudential Ins. Co. of Am., 948 A.2d 1285, 1289 (N.J. 2008). If the plain language of the provision is clear, "that is the end of the inquiry." Chubb Custom, 948 A.2d at 1289.

Beginning with the plain language of the Policies, as the district court found and Millennium concedes, the Endorsements provided coverage only with respect to "direct contributing properties." Millennium argues that the term "direct" is ambiguous because it could refer either to the legal relationship between the contributing property and the insured or the physical relationship between those parties. We find the term "direct" to be clear as used in the Policies and without ambiguity.

The term "direct" is defined as "proceeding from one point to another in time or space without deviation or interruption," "transmitted back and forth without an intermediary," or "operating or guided without digression or obstruction."

14

<u>Webster's Third New International Dictionary</u> 640. Thus, for Apache to be considered a <u>direct</u> contributing property to Millennium, it must have supplied Millennium with materials necessary to the operation of its business "without deviation or interruption" from "an intermediary."[7] <u>Id.</u>

On the undisputed facts of this case, neither Apache nor Apache's facilities on Varanus Island can be considered a "direct contributing property" of Millennium. Millennium does not dispute that it received its gas from Alinta, and that Alinta—and not Apache—had the sole ability to control the amount of gas directed to Millennium, to determine the rate at which Millennium would be charged for that gas, and even to shut the gas off completely. Indeed, Millennium concedes that it has no legal relationship, direct or otherwise, with Apache.

---

[7] Our colleague in dissent argues that the term "direct" is ambiguous as used in the Policies because the dictionary contains another definition for the term, "from the source or the original without interruption or diversion." <u>See</u> <u>Webster's Third New International Dictionary</u> 640. However, the definition cited to in the dissent is the adverbial definition of the term "direct," even though the term is clearly used as an adjective in the operative policy phrase, "direct contributing properties." Regardless, the phrase "without interruption or diversion" as used in the adverbial definition of the term "direct" has the same meaning as the phrase "without digression or obstruction" as used in the adjectival definition, demonstrating that the term "direct" has a single clear, unambiguous meaning. Even using the phrase selected by the dissent, it is unambiguous that there is no "direct" transfer of gas from Apache to Millennium because of the unescapable fact of the "interruption or diversion" by the presence of Alinta and the DB Pipeline as interrupting intermediaries.

Millennium also does not dispute that it received its gas by way of the DB Pipeline, and that the DB Pipeline is neither owned nor operated by Apache. Nor does Millennium dispute that Apache relinquished both legal title and physical control over the gas once it entered the DB Pipeline. In fact, Millennium concedes that Apache had no control over whether Millennium received its gas and that, due to commingling, Millennium could not demonstrate how much, if any, of the gas it received originated with Apache. Thus, neither Apache nor Apache's facilities had a direct physical relationship with Millennium.

Whatever the relationship between Apache and Millennium, it was clearly interrupted by "an intermediary," Alinta, who took full physical control of Apache's gas before delivering indistinguishable commingled gas to Millennium. That relationship was also interrupted by an intervening step, the physical insertion of the gas into the DB Pipeline, at which point Apache relinquished all physical control over that gas. Under any view of the relevant facts, Apache can therefore be only an indirect contributing property to Millennium, coverage of which is not included in the terms of the Policies.[8]

---

[8] The Insurers failed to argue in their briefing that the Binders, which stated directly that "THERE SHALL BE NO COVERAGE FOR INDIRECT SUPPLIERS/RECIPIENTS," J.A. 1289, were the operative documents at the time of the explosion on Varanus Island. Had the Insurers properly made that argument before this (Continued)

16

Having concluded that, on the plain language of the Policies, Apache cannot be considered a direct contributing property to Millennium, we consider Millennium's alternative argument that it could also receive coverage under the "for the account of" clause of the Endorsements. Millennium's alternative contention fails for the same reason as its primary argument. Under the plain language of the Policies, coverage is triggered only by damage to or destruction of direct contributing properties. Because Apache is at most an indirect supplier to Millennium, there can be no coverage under any reading of the "for the account of" clause. Therefore, Millennium presents no plausible reading of the Policies under which it could receive coverage for its CBI losses.[9]

IV

For the foregoing reasons, the judgment of the district court is reversed, and we remand the case to the district court for entry of summary judgment in favor of the Insurers.

REVERSED AND REMANDED

---

Court, that language would also demonstrate that Millennium had no coverage on the facts of this case.

[9] As we find no basis for coverage of Millennium's CBI losses under the Endorsements, Millennium's breach of contract claim, as pleaded, also must fail.

17

WYNN, Circuit Judge, dissenting:

On June 3, 2008, a massive explosion at a natural gas production facility on Varanus Island, Australia disrupted the availability of natural gas throughout Western Australia. Appellant Millennium's supply of natural gas ceased later that same day, requiring it to shut down operations at its titanium dioxide production facilities, and resulting in over $10 million in damages. The sole question we must decide is whether the contingent business interruption endorsements of the insurance contracts between Millennium and Appellees National Union and ACE (together, the "Insurers") require the latter to cover Millennium's losses.

Although the majority opinion provides a reasonable interpretation of the disputed portions of the insurance policies, the district court articulated an equally reasonable alternate interpretation. Because "no writing is unambiguous if 'susceptible of two reasonable interpretations[,]'" Atalla v. Abdul-Baki, 976 F.2d 189, 192 (4th Cir. 1992), I find the policies to be ambiguous. Like the district court, I would thus evaluate the extrinsic evidence for an indication of the parties' intent in drafting the ambiguous policy provisions. And like the district court, I would find that none of the proffered evidence reveals that intent. It follows that I would affirm the district court's decision to apply the doctrine of

18

*contra* *proferentem* to resolve the ambiguity in favor of Millennium and against the Insurers. Accordingly, I must respectfully dissent.

I

A

For the policy year at issue, 2008–09, Millennium obtained insurance coverage through its broker, Marsh. Millennium's coverage consisted of "master policies" issued by National Union and ACE and local policies issued by Australian companies. The master policies covered Millennium for up to $450 million per occurrence in aggregate losses, with each insurer bearing responsibility for 50% of any covered loss. The disputed provisions are for contingent business interruption ("CBI") coverage, which is "a relatively recent development in insurance law[.]" Zurich Am. Ins. Co. v. ABM Indus., Inc., 397 F.3d 158, 168 (2d Cir. 2005).

CBI coverage "protects against the loss of prospective earnings because of the interruption of the insured's business caused by an insured peril to property that the insured does not own, operate, or control." CII Carbon, L.L.C. v. Nat'l Union Fire Ins. Co. of La., Inc., 918 So. 2d 1060, 1061 n.1 (La. Ct. App. 2005). CBI coverage is distinct from "[r]egular business interruption insurance[, which] replaces profits lost as a

19

result of physical damages to the insured's" own property. Archer Daniels Midland Co. v. Hartford Fire Ins. Co., 243 F.3d 369, 371 (7th Cir. 2001).

Endorsement 8 of each of Millennium's master policies sets forth the CBI coverage. The relevant portion of Endorsement 8 reads as follows:

**CONTINGENT BUSINESS INTERRUPTION**
**CONTRIBUTING PROPERTY(IES)**
(Not Operated By The Insured)

**A.   AMOUNT OF INSURANCE:**

**$(As per declarations)** Only against loss directly resulting from necessary interruption of business conducted on premises occupied by the insured, caused by damage to or destruction of any of the real or personal property described below and referred to as CONTRIBUTING PROPERTY(IES) and which is not operated by the Insured, by the peril(s) insured against during the term of this Policy, which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured and results directly in a necessary interruption of the Insured's business.

**B.   SCHEDULE OF LOCATION(S):**

The following locations must be direct suppliers of materials to the Insured's locations or coverage is deemed to be void:

| LOCATION NO. | CONTINGENT CONTRIBUTING PROPERTY | LIMIT OF LIABILITY |
|---|---|---|
| | **DIRECT ONLY** | **AS STATED IN DECLARATIONS**[1] |

---

[1] The most significant difference between the National Union and the ACE Endorsements is that the ACE policy contains the phrases "DIRECT ONLY" and "AS STATED IN DECLARATIONS" as shown (Continued)

**C.   COVERAGE:**

Subject to all terms, conditions and stipulations of the Policy to which this endorsement is attached, not in conflict herewith, this Policy is extended to cover only against loss directly resulting from necessary interruption of business conducted on premises occupied by the Insured, caused by damage to or destruction of any of the real or personal property described above and referred to as CONTRIBUTING PROPERTY(IES) and which is not operated by the Insured, by the peril(s) insured against during the term of this Policy, which wholly or partially prevents the delivery of materials to the Insured or to others for the account of the Insured and results directly in a necessary interruption of the Insured's business.

J.A. 336, 450

The value of the CBI coverage is set forth in the Declarations of the master policies. The coverage limit is $25,000,000 for locations that Millennium has named in the policy, whereas the coverage limit is $10,000,000 for locations that are not named or listed in the policy. The Declarations refer to both named and unnamed locations as "DIRECT CONTRIBUTING OR RECIPIENT PROPERTY(IES)." J.A. 303, 416.

B

The salient facts giving rise to this suit are straightforward and undisputed. At all relevant times,

---

here. The National Union policy, by contrast, contains nothing in the columns shown above.

Millennium was in the business of producing titanium dioxide, a white pigment used in a variety of applications including paints and plastics. Millennium operated two interdependent factories near Bunbury, Australia, which relied primarily on natural gas for energy. Like many businesses in Western Australia, Millennium purchased its natural gas from a supplier or an aggregator, rather than directly from a producer. Millennium had a natural gas supply contract with one such entity, Alinta Sales Pty Ltd. ("Alinta").

Alinta obtained the gas that it resold from multiple producers in Western Australia, including Apache Corporation ("Apache"), which supplied at least 20% of the gas that Alinta bought and resold. Pursuant to the agreement between Alinta and Apache, Alinta took title to Apache's gas when the gas entered a major Western Australian gas transmission line known as the Dampier to Bunbury Natural Gas Pipeline ("Pipeline"). The Pipeline is a government-regulated common carrier owned by third parties who charge pipeline users a fee based on the distance their gas travels. After the gas leaves the Pipeline, it is transported to end users via a network of distribution lines.

Alinta consumes a small amount of the natural gas that it purchases for its own operations. And although it takes title to the gas, it never physically possesses the gas that it sells to its customers because it does not own the transmission or

22

distribution facilities.[2]  Indeed, because the gas molecules are commingled as soon as they enter the Pipeline, it is impossible to tell either the source or the owner of any given molecule at any given time.  Notwithstanding the impossibility of determining the source or the ownership of any particular gas molecule, the title to a specified volume of gas passed from Alinta to Millennium at the inlet point of Millennium's production facilities.

On June 3, 2008, a massive explosion and fire occurred at Apache's production facilities on Varanus Island, off the coast of Western Australia.  The explosion caused the interruption of 20% to 30% of the natural gas supply in Western Australia.  Apache immediately issued a notice of force majeure to Alinta, and Alinta immediately issued the same to Millennium.  Shortly thereafter, Millennium notified the Insurers of its claim of lost business income through its broker, Marsh.  The parties agree that the damages total $10,850,000, but the Insurers denied Millennium's claim because "[t]here is no direct supply of gas between [Millennium] and Apache."  J.A. 760.

_____

[2] The Insurers seem to dispute Millennium's statement that Alinta never took physical possession of the gas.  But they offer no evidence to establish that the gas that they purchased ever made its way into a vessel that was owned or controlled by Alinta.  The Insurers merely reassert that Alinta owned the title to the gas after it was injected into the Pipeline, a fact that is neither disputed nor probative of whether Alinta physically possessed the gas.

23

C

On July 17, 2009, Millennium filed this suit alleging, among other things, declaratory relief, breach of contract, and bad faith. After a lengthy discovery process and the presentation of a "virtual cornucopia of extrinsic evidence," Millennium Inorganic Chems. v. Nat'l Union, 893 F. Supp. 2d 715, 736 (D. Md. 2012), the parties submitted cross motions for summary judgment.

In a well-reasoned opinion, the district court analyzed the language of the policies and determined that multiple reasonable interpretations existed for two disputed provisions in Endorsement 8. The district court then analyzed the extrinsic evidence and found that "none of it presents a dispute of material fact for a fact finder to resolve[] because none of the extrinsic evidence sheds light on what the parties' mutual intent was at the time that the Master Policies were established." Id. The district court thus applied the doctrine of contra proferentem to resolve the ambiguity in favor of Millennium by holding that "Apache's natural gas production facility was a 'direct contributing property' to Millennium's Bunbury Operations, . . . because Apache's facility physically provided a direct supply of natural gas to Millennium's premises, despite the fact that Apache and Millennium had no direct contractual relationship." Id. at 737. The district

24

court conducted a similar analysis and reached the same conclusion as to the second disputed phrase in Endorsement 8, "for the account of the Insured."  See id. at 737–39.

The district court granted Millennium's motion for partial summary judgment regarding its declaratory judgment claim and granted the Insurers' motion for summary judgment regarding Millennium's bad faith claim.  The parties jointly moved for entry of judgment, which the district court granted on January 11, 2013.  The Insurers appealed.


II

The parties initially disputed whether New York or New Jersey law governs the interpretation of their insurance contracts.  Like the district court, I perceive little difference between the two states' laws.  See Millennium, 893 F. Supp. 2d at 728.

In both states:  Insurance contracts are to be interpreted according to their "plain and ordinary meaning."  Voorhees v. Preferred Mut. Ins. Co., 607 A.2d 1255, 1260 (N.J. 1992).  See also Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co., Inc., 945 N.E.2d 1013, 1017 (N.Y. 2011) ("In resolving insurance disputes, we first look to the language of the applicable policies.  If the plain language of the policy is determinative, we cannot rewrite the agreement by disregarding that language.")

25

(citations omitted). But "[i]f the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists." Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 948 A.2d 1285, 1289 (N.J. 2008). See Mostow v. State Farm Ins. Cos., 668 N.E.2d 392, 394 (N.Y. 1996) ("Because the policy may be reasonably interpreted in two conflicting manners, its terms are ambiguous.").

If a provision is ambiguous, "a court may look to extrinsic evidence as an aid to interpretation." Chubb, 948 A.2d at 1289. See Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002) ("Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide."). Extrinsic evidence is relevant only if it sheds light on the parties' intent at the time of contracting. Newin Corp. v. Hartford Acc. & Indem. Co., 467 N.E.2d 887, 889 (N.Y. 1984). And if a determination as to the parties' intent turns on "the credibility of extrinsic evidence[,]" "such determination is to be made by the jury." Hartford Accident & Indem. Co. v. Wesolowski, 305 N.E.2d 907, 909 (N.Y. 1973).

In the absence of clear policy language or relevant extrinsic evidence, courts must rely on additional rules of contract interpretation to apply the terms of an ambiguously worded provision to the facts at hand. "[C]overage provisions

26

are to be read broadly, exclusions are to be read narrowly, potential ambiguities must be resolved in favor of the insured, and the policy is to be read in a manner that fulfills the insured's reasonable expectations." Selective Ins. Co. of Am. v. Hudson East Pain Mgmt. Osteopathic Medicine, 46 A.3d 1272, 1277 (N.J. 2012). See Westview Assocs. v. Guaranty Nat'l Ins. Co., 740 N.E.2d 220, 223 (N.Y. 2000) ("If the language of the policy is doubtful or uncertain in its meaning, any ambiguity must be resolved in favor of the insured and against the insurer.") (citation omitted). "When an insurance carrier drafts an ambiguously worded provision and attempts to limit its liability by relying on it, we will construe the language against the carrier." Metro. Prop. & Cas. Ins. Co. v. Mancuso, 715 N.E.2d 107, 112 (N.Y. 1999).

"It has long been the rule that ambiguities in a contractual instrument will be resolved contra proferentem, against the party who prepared or presented it." 151 West Assocs. v. Printsiples Fabric Corp., 460 N.E.2d 1344, 1345 (N.Y. 1984). When construing an ambiguous policy, "courts should consider whether more precise language by the insurer, had such language been included in the policy, 'would have put the matter beyond reasonable question.'" Gibson v. Callaghan, 730 A.2d 1278, 1282 (N.J. 1999) (quoting Mazzilli v. Accident & Cas. Ins. Co., 170 A.2d 800, 803 (N.J. 1961)).

27

In short, these cases convincingly show that there is little difference between the two states' laws. But to the extent that applicable New York and New Jersey law differ, it is with respect to contra proferentem. Whereas New York seems to use the doctrine anytime a contract is not jointly drafted, New Jersey seems to require unequal bargaining power before it will favor an insured. Compare Taylor v. U.S. Cas. Co., 199 N.E. 620, 622 (N.Y. 1936) with Chubb, 948 A.2d at 1294 and Pacifico v. Pacifico, 920 A.2d 73, 78 (N.J. 2007).

Here, this is a distinction without a difference. Although Millennium is a sophisticated commercial entity and employed a broker to obtain its policies, it did not possess equal bargaining power with the Insurers. Therefore, even under New Jersey law, contra proferentem would still be available. But were it necessary to choose between New York and New Jersey law, I would apply New York law for the same reasons that the district court articulated. Millennium, 893 F. Supp. 2d at 727 (conducting a lex loci analysis and determining that New York law would apply because both policies were countersigned by the Insurers in New York).

III

A

Turning now to the Insurers' appeal, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the district court's grant of a motion for summary judgment de novo. See Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995).

Where, as here, the district court considered cross motions for summary judgment, we "must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quotation marks omitted). In considering each motion, we "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (quotation marks omitted).

B

The majority opinion outlines a reasonable interpretation of the disputed portions of Endorsement 8. For example, the majority opinion provides a dictionary definition of "direct" and concludes that under its chosen definition, "neither Apache

29

nor Apache's facilities on Varanus Island can be considered a 'direct contributing property' of Millennium." Ante at 15.

The problem for the majority opinion's reasoning is that other equally reasonable alternative explanations exist. For example, an alternate definition for "direct" can be found on the same page of the same dictionary as that cited in the majority opinion, yet it supports the conclusion that Apache was indeed a direct contributing property. Specifically, "direct" is also defined as being "from the source or the original without interruption or diversion." Webster's Third New International Dictionary 640. As stated by the district court: "Regardless of whether Millennium contracted with Alinta or contracted directly with Apache, the pressurized natural gas still would flow directly from Apache's facility through the [Pipeline] to Millennium's Bunbury Operations by operation of . . . the law of physics." Millennium, 893 F. Supp. 2d at 735 (quotation marks omitted).[3]

---

[3] The majority opinion takes issue with the definition cited above, noting that it is "the adverbial definition of the term 'direct,' even though the term is clearly used as an adjective in the operative policy phrase, 'direct contributing property.'" Ante at 15 n.7. But the issue here is not whether the term "direct" is an adverb that modifies the word "contributing" or an adjective that modifies the term "contributing property." Nor is the issue a question of which of the over 200 available dictionaries we should selectively choose to find the definition that satisfies our own interpretation of the policies. See, e.g., OED Online, http://www.oed.com/view/Entry/53293?rskey (Continued)

30

Moreover, no evidence suggests that Alinta has the ability to divert natural gas once it is injected into the Pipeline. In fact, because it does not own any of the transmission or distribution lines through which the natural gas flows, the evidence indicates that Alinta has just as much physical control over the gas as does Apache, which is to say, none. Because the policies do not describe the nature of the direct relationship required for something to be a "direct contributing property," I find this to be sufficient for Millennium to withstand the Insurers' motion for summary judgment.

In fact, and as explained by the district court, the language of Endorsement 8 is written in terms of the relationships between physical properties rather than the relationships between people and entities. First, the Endorsement uses the words "CONTRIBUTING PROPERTY(IES) for a subtitle." Second, Section "B" limits coverage to "locations" that must be direct suppliers. Third, Section "C" covers losses attributable to damage or destruction of "real or personal

=x0vIbu&result=2&isAdvanced=false (last visited Feb. 06, 2014) (defining the adjectival form of "direct" as "[s]traight, undeviating in course; not circuitous or crooked") and Oxford Dictionaries Online, http://www.oxforddictionaries.com/us/ definition/american_english/direct?q=direct (last visited Feb. 6, 2014) (defining the adjectival form of "direct" as "extending or moving from one place to another by the shortest way without changing direction or stopping").

property . . . not operated by the Insured . . . ." All of this "suggests that the physical relationship between the properties is as or more important than the legal relationship between the properties' owners." Millennium, 893 F. Supp. at 735.

Additionally, the fact that it is impossible to trace any of the gas molecules to Apache is of no import in determining whether a physical relationship existed between Apache and Millennium. If it mattered where each molecule came from or which molecule belonged to whom, Alinta would have no way of knowing that it actually owned any of the gas that it transferred to its customers. The Insurers' arguments regarding the gas molecules are simply a red herring.

C

To be sure, reasonable alternate interpretations of the contested provisions of Endorsement 8 exist. As I noted above, the majority opinion provides one such reasonable interpretation for each provision. The district court provides a few more. See Millennium, 893 F. Supp. 2d at 736. For example, the district court noted that "[i]t is not an unreasonable interpretation of the Master Policies to conclude that, by providing only 'direct' CBI coverage, the Insurers sought to limit their exposure to situations in which the insured lacked the kind of influence over a contributing property that comes

with contractual privity." Millennium, 893 F. Supp. 2d at 736. But, as with the other reasonable interpretations, "the Master Policies do not say this expressly[,]" id. and the plain language of the policies cannot resolve the ambiguity. The district court also explained that the "for the account of clause" was ambiguous because the policies fail to name a party who must hold the account, and one could reasonably conclude that either Apache or Alinta could "hold the 'account of the Insured'" to trigger coverage. Id. at 739. The only thing we can conclude from this recitation of competing reasonable interpretations is that the language of the policies is ambiguous. See Atalla, 976 F.2d at 192 ("[N]o writing is unambiguous if susceptible of two reasonable interpretations[.]") (quotation marks omitted).

I would, therefore, proceed to analyze the extrinsic evidence submitted by the parties. Although the record in this case is nearly 2,200 pages long, I agree with the district court's conclusion that none of the extrinsic evidence is admissible because none of it provides evidence of the parties' intent at the time the provisions of Endorsement 8 were drafted. See Millennium, 893 F. Supp. 2d at 737, 739.

Because none of the extrinsic evidence is relevant or admissible, there is nothing for a jury to consider, and it is "the responsibility of the court to interpret written

33

instruments." Wesolowski, 305 N.E.2d at 909 (internal citation omitted). We must, therefore, rely on well-settled rules of contract interpretation to decide the case.

Here, the district court applied the doctrine of contra proferentem to construe the ambiguous policies in favor of Millennium and against the Insurers, and it granted Millennium's motion for partial summary judgment as to its declaratory judgment claim. Millennium, 893 F. Supp. 2d at 739. I agree with the district court, and I would, therefore, affirm. For this and the other reasons discussed above, I must respectfully dissent.