**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-6447

JONATHAN ANTHONY LEE TORRES,

Plaintiff - Appellant,

v.

NATHAN BALL, Sergeant, Buncombe County Sheriff Office, individual capacity; DANE R. ONDERDONK, Deputy, Buncombe County Sheriff Office, individual capacity; TIMOTHY R. TAYLOR, Deputy, Buncombe County Sheriff Office, individual capacity,

Defendants - Appellees.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Martin K. Reidinger, Chief District Judge. (1:19-cv-00094-MR)

Argued: March 9, 2023                     Decided: April 17, 2023

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Zachary L. Sanders, Sophie Spears, NEW YORK UNIVERSITY SCHOOL OF LAW, New York, New York, for Appellant. Michael A. Ingersoll, WOMBLE BOND DICKINSON (US) LLP, Charlotte, North Carolina, for Appellees. **ON BRIEF:** Daniel S. Harawa, Daniel J. Cook, Student Counsel, Federal Appellate Clinic, NEW YORK UNIVERSITY SCHOOL OF LAW, New York, New York, for Appellant. Curtis W. Euler, BUNCOMBE COUNTY, Asheville, North Carolina, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jonathan Anthony Lee Torres ("Appellant") appeals the district court's order granting summary judgment in favor of Sergeant Nathan Ball ("Ball"), Deputy Timothy R. Taylor ("Taylor"), and Deputy Dane R. Onderdonk ("Onderdonk") (collectively "Appellees") on Appellant's 42 U.S.C. § 1983 claims stemming from a traffic stop that ended with Appellant's arrest. Because Appellant had several outstanding arrest warrants, the Buncombe County Sheriff's Office ("BCSO") issued an Attempt to Locate ("ATL") notice to law enforcement, informing officers to be on the lookout for Appellant. Prior to initiating the traffic stop, Sergeant Ball received a tip from a confidential informant that Appellant was driving a dark green Honda with dark-tinted windows and could be located at a specific address.

The district court determined that the traffic stop was lawful because Sergeant Ball had reasonable suspicion to believe that Appellant was driving the target vehicle. But Appellant argues that the tip lacked sufficient indicia of reliability to support a finding of reasonable suspicion. For the reasons set forth below, we conclude that the totality of the circumstances, including the fact that Sergeant Ball knew Appellant had multiple outstanding arrest warrants and corroborated significant features of the informant's tip, support a finding of reasonable suspicion necessary to conduct the initial investigatory stop.

Therefore, we affirm.

I.

On February 26, 2018, Sergeant Ball, an officer with the BCSO, received an ATL regarding Appellant. The ATL stated that Appellant had two outstanding warrants for

3

breaking and entering and larceny-related crimes in Buncombe County and "9+ outstanding warrants" in nearby Henderson County. J.A. 97.[1] The ATL also listed Appellant's last known address as 45 Edwards Road, Fairview, North Carolina.

During the February 27, 2018 BCSO Command Staff Meeting, Sergeant Ball was provided a photo of Appellant and informed that he was a person of interest with several outstanding warrants, including two arrest warrants in Buncombe County for breaking and entering and larceny after breaking and entering. Shortly after the meeting, Sergeant Ball used Buncombe County's record system to verify Appellant's two outstanding warrants in that county. Sergeant Ball also reviewed Appellant's lengthy criminal history,[2] noting that it included charges and convictions for crimes such as assault with a deadly weapon, carrying a concealed firearm, intimidating a witness, communicating threats, and possession of drugs. As a result of Appellant's criminal history, Sergeant Ball believed he "needed to use caution" if he had to arrest Appellant. J.A. 91.

In an effort to locate Appellant, Sergeant Ball spoke with a confidential informant ("CI") who, according to Sergeant Ball, "ha[d] provided [him] with reliable information in the past." J.A. 91. The CI told Sergeant Ball that Appellant had been staying at 130 Flat Top Mountain Road, Fairview, North Carolina, and drove a dark green Honda Accord with dark tinted windows. Thereafter, when not responding to calls for service, Sergeant Ball

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] Buncombe County records confirmed that Appellant had been charged with over one hundred separate offenses over an 18-year period and had been arrested dozens of times.

attempted to locate Appellant by frequently checking the two addresses -- 45 Edwards Road (provided by the ATL) and 130 Flat Top Mountain Road (provided by the CI).

On March 3, 2018, at approximately 3:00am, Sergeant Ball drove past 130 Flat Top Mountain Road and saw a dark green Honda Accord (the "Vehicle") -- the same make, model, and color vehicle that the CI said Appellant was driving -- parked in the driveway with the trunk open. Sergeant Ball also noticed a male subject walking near the Vehicle. Believing that the Vehicle would not leave 130 Flat Top Mountain Road if a patrol car was in sight, Sergeant Ball drove toward Old Fort Road, parked in another driveway, turned off his headlights, and watched the Vehicle. A few minutes later, the Vehicle passed Sergeant Ball's position and Sergeant Ball pursued. The Vehicle turned left on to Old Fort Road and then turned into a private driveway at 714 Old Fort Road. According to Appellant, he and his fiancée stopped to return an "amp" to a friend on their way to Appellant's apartment in Hendersonville, North Carolina. J.A. 186.

"Fearing a foot chase," Sergeant Ball activated his body camera. J.A. 93. Sergeant Ball testified that, at this time, he believed Appellant was driving the Vehicle and had multiple outstanding felony arrest warrants. When the Vehicle was about halfway up the driveway, Sergeant Ball turned on his cruiser's blue lights, called in the traffic stop, and reported the Vehicle's license plate information. The Vehicle continued to the end of the driveway before coming to a full stop. Sergeant Ball exited his police cruiser, drew his firearm, shined his flashlight at the Vehicle, and loudly ordered the driver to show his hands. Sergeant Ball testified that his weapon remained pointed at the ground and that he never pointed his weapon at the driver or passenger. Appellant, however, claims that

5

Sergeant Ball pointed his weapon toward Appellant while ordering Appellant to show his hands. Although the weapon is not visible on the body camera footage, the sound of Sergeant Ball unholstering his firearm is audible.

As he approached the Vehicle, Sergeant Ball testified that he recognized Appellant as the driver. Appellant immediately complied with Sergeant Ball's instructions, first poking his hands outside of the car window before exiting the Vehicle and laying stomach-down on the ground. While on the ground, Sergeant Ball handcuffed Appellant and searched his pockets for weapons. Sergeant Ball then instructed Appellant to roll onto his side and asked Appellant whether he had any outstanding warrants. Appellant replied, "not that I know of." J.A. 369 [Ball Body Camera at 2:27–2:30].

After sitting Appellant upright, Sergeant Ball received a call back from dispatch informing him that the Vehicle Appellant had been driving was reported stolen. Sergeant Ball then conducted another pat down search and discovered two cellophane wrappers containing a white powdery substance in one of Appellant's pants pockets. Based on his training and experience and the texture of one of the substances, Sergeant Ball believed one wrapper contained methamphetamine and the other contained heroin.

When Appellant asked why he was pulled over, Sergeant Ball responded that Appellant had outstanding warrants and that the Vehicle Appellant had been driving was stolen.[3] Appellant denied that the Vehicle was stolen. Sergeant Ball then searched

---

[3] In his affidavit in support of Appellee's motion for summary judgment, Sergeant Ball emphasized that the Vehicle being stolen was *not* the basis for the traffic stop because Sergeant Ball did not learn it was stolen until *after* Appellant was already in custody.

6

Appellant's person again, after which he called in Appellant's full name and date of birth to confirm Appellant's outstanding warrants. Sergeant Ball then explained to Appellant that he had several outstanding warrants in Buncombe County and "eight maybe" elsewhere. J.A. 369 [Ball Body Camera at 6:10–6:20].

Shortly thereafter, deputies Taylor and Onderdonk arrived on the scene. The deputies searched the Vehicle and found drug paraphernalia, including two glass pipes with apparent drug residue and rubber tourniquets. Deputy Onderdonk collected the evidence and turned it over to Sergeant Ball for processing. Meanwhile, Sergeant Ball arrested Appellant on the two outstanding warrants for felony breaking and entering and felony larceny after breaking and entering. Sergeant Ball then took Appellant to Deputy Taylor's patrol vehicle. Sergeant Ball instructed Deputy Taylor to take Appellant to a detention facility and charge him with possession of a stolen vehicle, possession of methamphetamine, and possession of drug paraphernalia.

Deputy Taylor took Appellant to the Buncombe County Detention Facility. There, Detective Aaron Lawson served Appellant with the outstanding warrants for breaking and entering and larceny after breaking and entering. Based on the information provided by Deputy Taylor, a magistrate judge issued criminal warrants for possession of a stolen vehicle, possession of methamphetamine, and possession of drug paraphernalia in connection with the March 3, 2018 stop.

Shortly after Appellant's arrest, Sergeant Ball created a "case synopsis" for the prosecutor regarding Appellant's possession of a stolen vehicle, possession of methamphetamine, and possession of drug paraphernalia charges. J.A. 30. Sergeant Ball

7

also had drug samples from the two packages found on Appellant's person sent to the state laboratory for testing.

On November 7, 2018, Appellant's possession of methamphetamine charge was dismissed because the state laboratory never tested the substance. On March 12, 2019, Appellant entered into a plea agreement with the State of North Carolina. Appellant agreed to plead guilty to two counts of being a habitual felon, two counts of possession of a Schedule I controlled substance, and one count each of possession of a Schedule II controlled substance, possession of drug paraphernalia, resisting a public officer, felony breaking and entering, and felony larceny after breaking and entering. As part of the plea agreement, the State agreed to dismiss several charges, including charges for possession of heroin, possession of Schedule II fentanyl, possession of drug paraphernalia, possession of a stolen motor vehicle, and possession of a firearm by a felon. Appellant was sentenced to 20 to 33 months of imprisonment for felony breaking and entering and felony larceny after breaking and entering and 50 to 72 months of imprisonment for the remaining convictions, to be served concurrently.

On March 27, 2019, Appellant filed a civil action pursuant to 42 U.S.C. § 1983 against Sergeant Ball, Deputy Taylor, and Deputy Onderdonk, raising several federal and state constitutional claims. Specifically, Appellant alleged that (1) he was stopped without probable cause or reasonable suspicion; (2) he was unlawfully arrested; (3) he was unlawfully searched when Sergeant Ball reached into his pocket before conducting a pat down; (4) the Vehicle was unlawfully searched; (5) Sergeant Ball used excessive force when seizing Appellant because Sergeant Ball yelled commands and pointed his gun at

8

Appellant during the stop, despite Appellant complying with Sergeant Ball's directions and making no attempt to flee; and (6) Appellant was unlawfully charged and falsely imprisoned for 24 days because the charges stemming from the traffic stop were eventually dismissed.[4]   Although Appellant referenced other bases for his claims, in reviewing the complaint for frivolousness pursuant to 28 U.S.C. § 1915(e), the district court grouped Appellant's claims into three categories: (1) Fourth Amendment claims surrounding the traffic stop and subsequent searches; (2) an excessive force claim; and (3) a malicious prosecution claim.  Appellant has not challenged the district court's interpretation of his claims.

On June 15, 2020, Appellees moved for summary judgment.  Appellant subsequently filed a cross-motion for summary judgment that included Appellees' discovery responses, BCSO policies, Sergeant Ball's investigation report, an event report, the warrants for Appellant's arrest, Sergeant Ball's case synopsis and body camera footage, Appellant's motion to suppress evidence seized from his person or the Vehicle on March 3, 2018, and other court documents.

On March 13, 2021, the district court granted Appellees' motion for summary judgment and denied Appellant's cross-motion.  The district court determined that the initial traffic stop was lawful because Sergeant Ball had "reasonable suspicion to believe

---

[4] In the complaint, Appellant also alleged that his fiancée was unlawfully searched, but the district court dismissed this claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) because Appellant lacked standing to assert Fourth Amendment violations on his fiancée's behalf. Order Re: Pl.'s Compl. at 8, *Torres v. Ball*, No. 1:19−cv−00094 (W.D.N.C. Mar. 27, 2019; filed Sept. 18, 2019), ECF No. 6.

that [Appellant] had multiple outstanding arrest warrants and was driving the Honda in question." J.A. 332.[5]

Appellant filed this timely appeal.

## II.

We review a district court's grant of summary judgment de novo. *Griffin v. Bryant*, 56 F.4th 328, 335 (4th Cir. 2022). A district court shall grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But "[o]nce a [party] makes a properly supported motion for summary judgment, the burden shifts to the [opposing party] to set forth specific facts showing that there is a genuine issue for trial." *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 817 (4th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When both parties file motions for summary judgment, as here, we apply the same standard of review to both motions, considering "each motion separately on its own merits to determine whether either [side]

---

[5] Appellant's formal Opening Brief fails to separately press his claims for excessive force, false arrest, false imprisonment, and malicious prosecution, arguing only that those claims should be reconsidered on remand if the initial stop is deemed illegal. Nor does Appellant address his state law claims or the issue of qualified immunity. Though Appellant argued several of these issues in his pro se informal brief, "we treat the formal brief as definitive of the issues for review and, applying the normal rule of waiver, consider only those issues, unless an inspection of the record indicates that failure to consider other issues might result in grave injustice." *Slezak v. Evatt*, 21 F.3d 590, 593 n.2 (4th Cir. 1994); *see also* Fed. R. App. P. 28(a)(5), (a)(8). Perceiving no such "grave injustice" here, we limit our review to the issues raised in the Opening Brief.

deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

III.

The Fourth Amendment's protection against unreasonable searches and seizures extends to investigatory stops "that fall short of traditional arrest." *Wingate v. Fulford*, 987 F.3d 299, 304 (4th Cir. 2021) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). However, "[f]or investigatory stops, the balance between the public interest and the individual's right to personal security tilts in favor of a standard less than probable cause." *Id.* at 305 (internal quotation marks omitted). Accordingly, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry*[6] stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985).

When assessing the constitutionality of traffic stops, we employ a two-prong analysis: First, we "assess whether the articulated bases for the traffic stop were legitimate." *United States v. Palmer*, 820 F.3d 640, 648–49 (4th Cir. 2016). "Second, we examine whether the actions of the authorities during the traffic stop were reasonably related in scope to the bases for the seizure." *Id.* (internal quotation marks omitted).

---

[6] In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court ruled that the Fourth Amendment prohibition on unreasonable searches and seizures is not violated when a police officer stops a suspect on the street and frisks him without probable cause to arrest, if the police officer has a reasonable articulable suspicion that the person has committed, is committing, or is about to commit a crime.

11

A.

Whether an officer's suspicion is legitimately "reasonable" and "articulable" depends on the totality of circumstances. *United States v. Cortez*, 449 U.S. 411, 417 (1981) (noting that reasonable suspicion involves the "totality of the circumstances—the whole picture"). "[F]actors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004).

We evaluate an officer's justification for an investigatory stop on an objective basis. *See Illinois v. Wardlow,* 528 U.S. 119, 123 (2000). "[I]f sufficient objective evidence exists to demonstrate reasonable suspicion, a [*Terry*] stop is justified regardless of a police officer's subjective intent." *United States v. Branch,* 537 F.3d 328, 337 (4th Cir. 2008). In cases where an informant's tip supplies part of the basis for reasonable suspicion, courts must ensure that the tip possessed sufficient "indicia of reliability." *Florida v. J.L.*, 529 U.S. 266, 270 (2000).

1.

Here, Appellant argues that "material inconsistencies" regarding the CI's tip preclude a grant of summary judgment for Appellees. Appellant's Opening Br. at 23. To support this argument, Appellant points to two differences between Sergeant Ball's description of the CI's tip in his case synopsis and his description of the tip in his affidavit in support of Appellee's motion for summary judgment. The case synopsis states that the CI told Sergeant Ball that Appellant "had been *frequenting* 130 Flat Top Mountain [Road]" and "was operating a dark green Honda *car* with dark tinted windows." J.A. 122 (emphasis

12

supplied). But, in his affidavit, Sergeant Ball testified that the CI told him that Appellant "has been *staying* at 130 Flat Top Mountain Road" and "has been driving a dark green Honda *Accord* with dark tinted windows." *Id.* at 91 (emphasis supplied).

We find that this matter of semantics does not create a *genuine* issue of material fact for two reasons. First, Appellant has failed to identify any meaningful difference between describing someone as "staying" at a particular location and "frequenting" that same location. To be sure, the word "staying" may suggest that one has been sleeping somewhere overnight, while the word "frequenting" may suggest something more akin to habitual daytime visits. But both terms indisputably indicate that the person described can likely be found at the given address because that person was physically present at that location on more than one occasion in recent days.

Next, we acknowledge that whether the CI identified a specific model (i.e., an "Accord") of car plays a role in evaluating the vagueness and genericness of the tip. *See, e.g.*, *United States v. Gondres-Medrano*, 3 F.4th 708, 717 (4th Cir. 2021) (acknowledging that "outlandish, vague, or contradictory" tips may defeat probable cause even when provided by reliable informants). But, unlike Sergeant Ball's affidavit, the case synopsis was not sworn testimony nor was it ever considered to be a complete and detailed account of the events at issue. By definition, a "synopsis" is "[a] brief or partial survey; a summary or outline." *See* Synopsis, Black's Law Dictionary (11th ed. 2019). Thus, a case synopsis is not meant to serve as an exhaustive description. So, it is neither surprising nor materially inconsistent with his initial case synopsis that Sergeant Ball's affidavit provides additional

13

information and details about the circumstances surrounding Appellant's stop, including more detailed information about the informant and the contents of the tip.

Further, none of the other attributes of the target vehicle -- i.e., a dark green Honda with dark tinted windows -- changed between the case synopsis and affidavit. Thus, while "Accord" may be more specific than "car," the case synopsis and affidavit are neither incompatible nor inconsistent. Instead, it appears from the record that Sergeant Ball's affidavit effectively clarifies and supplements his previous case synopsis rather than contradicting it. And "an apparent dispute is not 'genuine' within the contemplation of the summary judgment rule unless the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find the fact[s] in his favor." *Sylvia Dev. Corp.*, 48 F.3d at 818 (alteration in original) (internal quotation marks omitted). Thus, because Appellant relies solely on challenges to Sergeant Ball's credibility and has submitted no independent evidence to support his claims, Appellant has not met his burden of establishing a genuine issue of material fact as to the contents of the CI's tip.

Therefore, we proceed with our analysis accepting that at the time Sergeant Ball initiated the investigatory stop, the uncontroverted record evidence establishes the following: Sergeant Ball received an ATL indicating that Appellant had two outstanding arrest warrants in Buncombe County; in a BCSO meeting the next day, Appellant was discussed as a person of interest and a photo of Appellant was shown; Sergeant Ball verified Appellant's warrants in Buncombe County's record system at least four days prior to Appellant's arrest; a CI that had provided Sergeant Ball "with reliable information in the past," J.A. 91, told Sergeant Ball that Appellant was staying at 130 Flat Top Mountain

14

Road and was driving a dark green Honda Accord with dark tinted windows; and while investigating, Sergeant Ball saw a male suspect near a dark green Honda Accord at the address provided by the CI.

2.

It is undisputed that Sergeant Ball did not confirm Appellant's identity until *after* he had initiated the traffic stop. However, when police "have been unable to locate a person suspected of involvement in a past crime," and "have a reasonable suspicion . . . that a person they encounter was involved in or is wanted in connection with a completed felony," they may "briefly stop that person, ask questions, or check identification." *Hensley*, 469 U.S. at 229.

The tip Sergeant Ball received in this case was a key factor among the broader swath of information and circumstances known to Sergeant Ball at the time of the traffic stop. Appellant argues that the tip "lacked sufficient indicia of reliability" to support reasonable, articulable suspicion. Appellant's Opening Br. at 31. Appellant's argument centers largely on his contention that the CI's tip was an anonymous tip and that Sergeant Ball failed to obtain the corroboration necessary for anonymous tips. But there is a difference between a purely anonymous tip from an ordinary citizen-informer and a tip from a confidential police informer. And here, Sergeant Ball testified that he knew the CI and that the CI had previously given him reliable information. Thus, Sergeant Ball "relied not on an unknown informant but one whom he knew and who had provided reliable information in the past." *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002).

15

It is well established that a known, reliable informant "is entitled to far more credence than an unknown, anonymous tipster." *Bynum*, 293 F.3d at 197 (first citing *Florida*, 529 U.S. at 270; and then citing *Adams v. Williams,* 407 U.S. 143, 146–47 (1972)). Although it would have been preferable if Sergeant Ball "had expressly stated in his affidavit the basis for his statement as to his informant's reliability, he did at least swear . . . that he was relying on a known and proven confidential source, not a never-known, never-verified tipster." *Id.* And "corroboration can confirm the reliability of an informant who is known (rather than anonymous) but whose credibility is unknown to the officer." *Gondres-Medrano*, 3 F.4th at 716. "[W]here a tipster is shown to be right about some details, he is probably right about other alleged facts, . . . justifying reliance on the anonymous tip." *Id.* at 715.

For example, in *Adams v. Williams*, 407 U.S. 143 (1972), the Supreme Court addressed a known informant with no indication that prior information relayed by the informant had proven reliable. *Id.* at 146. There, while on patrol duty, a police officer was approached by a known person who informed the officer "that an individual seated in a nearby vehicle was carrying narcotics and had a gun at his waist." *Id.* at 144–45. The officer approached the vehicle to investigate the informant's report and tapped on the occupant's window. *Id.* The occupant rolled down the window and the officer reached into the car and removed a fully loaded revolver from the occupant's waistband. *Id.* at 145. The gun had not been visible to officer from outside the car, but it was in precisely the place indicated by the informant. *Id.* Because the officer knew the informant, the informant exposed himself to possible criminal prosecution or other consequences for

16

giving false information, and part of the tip was immediately verifiable at the scene, the Court held that the tip carried enough indicia of reliability to establish reasonable suspicion and justify the officer's stop, even though the Court questioned whether such a tip could establish probable cause. *Id.* at 147.

Likewise, in *Navarette v. California*, 572 U.S. 393 (2014), the Court found that an anonymous tip justified a traffic stop even where officers did not observe a single driving infraction. *Id.* at 400–01. There, a 911 dispatcher received a tip from an anonymous caller who reported that a pickup truck had just run her vehicle off the road. *Id.* at 395. The caller provided details about the make, model, color, and license plate of the vehicle as well as the direction the truck was traveling and nearest highway mile marker. *Id.* Two officers found the truck 20 miles down the road and followed it for five minutes. *Id.* The officers decided to stop the truck even though they did not see the driver make a single driving error. *Id.* When they approached the truck, the officers smelled marijuana and discovered 30 pounds of marijuana in the bed of the truck. *Id.* The driver and passenger of the truck moved to suppress the evidence, arguing that the traffic stop violated the Fourth Amendment because it was based solely on an anonymous tip and the officers lacked reasonable suspicion of criminal activity. *Id.* at 396. Because the anonymous caller provided details about the vehicle's make, model, color, and license plate; made the call to 911 (which could subject the caller to prosecution if she made a false report); and was "under the stress of excitement caused by a startling event" (making the call less likely to be preplanned), the Court held that the officers had reasonable suspicion to stop the truck and investigate whether the driver had run another vehicle off the road. *Id.* at 400, 403–04.

17

Here, the CI provided Sergeant Ball with details about the make, model, color, and a specific feature -- dark tinted windows -- of the vehicle Sergeant Ball could find Appellant driving. The CI also provided Sergeant Ball with a specific address where he could locate Appellant. It is undisputed that Sergeant Ball observed someone walking around a parked dark green Honda Accord with tinted windows in the driveway of the exact address provided by the CI.

Moreover, Sergeant Ball had been looking for Appellant since the BCSO issued an ATL for Appellant just a few days earlier. Sergeant Ball also knew Appellant had an extensive criminal history as well as several active outstanding warrants, including two in Buncombe County for felony breaking and entering and felony larceny after breaking and entering. The corroborating aspects of the tip sufficiently establish the informant's reliability, and the totality of the circumstances provided Sergeant Ball with sufficient justification to conduct an investigatory stop for the purpose of determining whether Appellant was the Vehicle's driver.[7] *See Hensley*, 469 U.S. at 229 (noting that law enforcement interests are stronger where suspect is wanted for felony offenses "or crimes involving a threat to public safety").

---

[7] Additionally, because it is a crime in North Carolina to make a "false, deliberately misleading, or unfounded report" to law enforcement in order to interfere with the law enforcement agency or "hinder or obstruct" an officer performing their duties, *see* N.C. Gen. Stat. Ann. § 14-225 (2022), the CI might have faced criminal liability if their report was wrong.

18

3.

Accordingly, the record demonstrates that Sergeant Ball's reason for conducting the investigatory traffic stop -- to ascertain the identity of the driver -- was legitimate and that he had reasonable suspicion to believe that Appellant was the driver.

B.

Lastly, we conclude that Sergeant Ball's actions after the stop were reasonably related to the scope of the stop. *See Palmer*, 820 F.3d at 649. After conducting a traffic stop, the officer must employ "the least intrusive means reasonably available to verify or dispel [his] suspicion in a short period of time." *Id.* (alteration in original) (internal quotation marks omitted). Here, Sergeant Ball had viewed a photograph of Appellant in the days leading up to Appellant's arrest and could recognize Appellant on sight. The record reflects -- and the body camera footage confirms -- that, after stopping the Vehicle and exiting his police cruiser, Sergeant Ball immediately approached the driver's side of the Vehicle and confirmed his suspicion that the driver was indeed Appellant, the fugitive he was looking for. Accordingly, the record supports the district court's determination that Sergeant Ball had reasonable suspicion to conduct the initial traffic stop.

IV.

For the foregoing reasons, the district court's order granting Appellees' motion for summary judgment is

*AFFIRMED.*

19